# Exhibit A

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

- - - - -

UNITED STATES OF AMERICA ex )
rel. MICHAEL J. DAUGHERTY, )
                                )
 Plaintiff and Relator,         ) Civil Action No.
                                ) 14-cv-4548
        vs.                     )
                                ) Judge Denise L. Cote
TIVERSA HOLDING CORP.,          )
TIVERSA INC., TIVERSA           )
GOVERNMENT INC., and ROBERT     )
BOBACK,                         )
                                )
        Defendant.              )

- - - - -

Deposition of GRIFFIN SCHULTZ

Pittsburgh, Pennsylvania

Thursday, July 18, 2019 - 8:36 a.m.

Reported by:

Marjorie Peters

Job No.: 25628

Page 2

1          DEPOSITION OF GRIFFIN SCHULTZ,
2    a witness herein, called by the Plaintiff/Relator
3    for examination, taken pursuant to the Notice, by
4    and before Marjorie Peters, a Registered Merit
5    Reporter, Certified Realtime Reporter and Notary
6    Public in and for the Commonwealth of Pennsylvania,
7    at Dickie McCamey & Chilcote, Two PPG Place, Unit
8    400, Pittsburgh, Pennsylvania, on Thursday,
9    July 18, 2019, at 8:36 a.m.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1             I N D E X
2    EXAMINATION                    PAGE
3    GRIFFIN SCHULTZ
4      By Mr. Hawkins                8
5
6        I N D E X   O F   E X H I B I T S
7    SCHULTZ EXHIBIT                PAGE
8    Exhibit 1    Schultz affidavit      16
9    Exhibit 2    30(b)(6) Notice        21
10   Exhibit 3    typed notes, TIVSDNY -   26
11   008373
12   Exhibit 4    Tiversa P2P statement of   27
13   work, 4.2010, TIVSDNY -
14   0053835400
15   Exhibit 5    Proposed Services, TSA,    33
16   5.2010, TIVSDNY -
17   007785-7792
18   Exhibit 6    Peer to Peer Monitoring    34
19   and Detection Services,
20   TIVSDNY - 007456-7457
21   Exhibit 7    Pilot Program P2P          36
22   Vulnerability Assessment,
23   June 2010, TIVSDNY -
24   00643-6661
25

Page 3

1         A P P E A R A N C E S
2    For the Plaintiff/Relator:
3      James W. Hawkins, Esq.
       JAMES W. HAWKINS ATTORNEY AT LAW
4      5470 Blair Valley Run
       Cumming, GA 30040
5      jhawkins@jameswhawkinsllc.com
       678.697.1278
6
7    For the Defendant Tiversa Holding Corp., Tiversa
     Inc., Tiversa Government Inc.:
8
       Christopher A. Lovato, Esq.
9      DICKIE MCCAMEY & CHILCOTE
       Two PPG Place
10     Unit 400
       Pittsburgh, PA 15222
11     clovato@dmclaw.com
       412.281.7272
12
13   For the Defendant Robert Boback:
14     Brandon J. Verdream, Esq.
       CLARK HILL PLC
15     One Oxford Centre
       301 Grant Street, 14th Floor
16     Pittsburgh, PA 15219
       bverdream@clarkhill.com
17     412.394.2332
18
19   ALSO PRESENT:
20   Michael J. Daugherty, Relator
21   Robert Kirtley
22   Andrew Halliwell, videographer
23
24
25

Page 5

1        I N D E X   O F   E X H I B I T S
2    SCHULTZ EXHIBIT                PAGE
3    Exhibit 8    Proposal, Federal Breach   38
4    Protection, July 2011,
5    TIVSDNY - 007574-7584
6    Exhibit 9    Statement of Work, Federal  38
7    Break Protection, July
8    2011, TIVSDNY -
9    007386-7397
10   Exhibit 10   P2P Monitoring & Forensic   39
11   Investigation Services,
12   Naval Air Command, 2010,
13   TIVSDNY - 009104-9121
14   Exhibit 11   TSA Kickoff Discussion,     40
15   August 2011, TIVSDNY -
16   009603-9637
17   Exhibit 12   Tiversa customer tickets,   40
18   TSA0002 [several pages]
19   Exhibit 13   June 2012 Report, TSA, [no  43
20   Bates]
21   Exhibit 14   Tiversa Web Monitoring      45
22   Overview, TIVSDNY -
23   006034-6038
24
25

Page 6

```
 1        I N D E X   O F   E X H I B I T S
 2   SCHULTZ EXHIBIT                   PAGE
 3   Exhibit 15    Data Feed Solutions        45
 4             Overview, TIVSDNY -
 5             006028-6032
 6   Exhibit 16    Leveraging P2P             46
 7             Cyberintelligence, TIVSDNY
 8             - 006236-6261
 9   Exhibit 17    P2P Monitoring Overview,   47
10             TIVSDNY - 0077937796
11   Exhibit 18    Tiversa Company            47
12             Background, TIVSDNY -
13             007371-7373
14   Exhibit 19    Executive Summary, TIVSDNY 48
15             - 007329-7338
16   Exhibit 20    Overview, Background P2P   49
17             Networks... TIVSDNY -
18             008263-8273
19   Exhibit 21    Overview, Background P2P   50
20             Networks... TIVSDNY -
21             008356-8366
22   Exhibit 22    File Takedown Services,    51
23             TIVSDNY - 00652-8654
24
25
```

Page 7

```
 1            P R O C E E D I N G S
 2            THE VIDEOGRAPHER:  This is tape
 3   number one of the videotaped deposition of Griffin
 4   Schultz in the matter of the United States of
 5   America, et al. v. Tiversa Holding Corp., et al.
 6   This is in the United States District Court for the
 7   Southern District of New York, Docket Number
 8   14-cv-4548.
 9            This deposition is being held at
10   Dickey McCamey Chilcote, Two PPG Place, Suite 400,
11   Pittsburgh, Pennsylvania, 15222, on July 18, 2019,
12   at approximately 8:36 a.m.
13            My name is Andrew Halliwell, and I'm
14   the legal video specialist.  The court reporter is
15   Marjorie Peters in association with TransPerfect
16   Legal Solutions.
17            Will counsel please introduce
18   themselves.
19            MR. HAWKINS:  My name is Jim
20   Hawkins.  I'm an attorney for the plaintiff and
21   relator, Michael J. Daugherty.
22            MR. LOVATO:  Chris Lovato on behalf
23   of the Tiversa entities.
24            MR. VERDREAM:  Brandon Verdream on
25   behalf of the defendant, Robert Boback.
```

Page 8

```
 1            THE VIDEOGRAPHER:  Marjorie, could
 2   you please swear in the witness.
 3            GRIFFIN SCHULTZ,
 4   a witness, having been first duly sworn, was
 5   examined and testified as follows:
 6            EXAMINATION
 7   BY MR. HAWKINS:
 8        Q.   Good morning, Mr. Schultz.  This will be
 9   the deposition of Tiversa's 30(b)(6) designee, and I
10   understand that you have been chosen to be the
11   designee.
12            MR. HAWKINS:  Mr. Levato, is it
13   correct that Mr. Schultz is the sole designee in
14   response to the Rule 30(b)(6) Notice of Deposition?
15            MR. LOVATO:  Per our prior
16   correspondence with the court, Mr. Schultz is the
17   sole remaining employee of Tiversa.  In that
18   capacity, he's the 30(b)(6) designee, yes.
19            MR. HAWKINS:  Ok.  Thank you very
20   much.
21   BY MR. HAWKINS:
22        Q.   Mr. Schultz, let me go over some ground
23   rules.  We want to have a very clear transcript and
24   we want to make sure that everybody understands one
25   another.  So what that means is if I ask you a
```

Page 9

```
 1   question that you don't understand or you can't
 2   hear, I'd love for you to tell me that you either
 3   don't understand it or you can't hear it.  I will be
 4   glad to either rephrase it or repeat it, so that you
 5   have a really clear understanding of what I'm
 6   asking.
 7            Is that okay with you?
 8        A.   Yes.
 9        Q.   Next ground rule.  I see you shaking
10   your head yes.  The court reporter is taking down
11   everything we say.  So you need to verbalize all of
12   your responses.  Try to avoid using words like
13   uh-huh and huh-uh because those are hard to
14   distinguish and sometimes there could be some
15   confusion.
16            So -- and you're shaking your head
17   now, and that's fine.  I haven't asked you a
18   question; but just try to remember that, and I'll
19   try to remind you if that happens.
20            Please don't hesitate to let me know
21   if you have any issues with any of my questions.
22            Also, if you need to take a break at
23   any time, that's fine.  I would just ask that if
24   there's a question pending, that you go ahead and
25   answer that question, unless your attorney has
```

1    instructed you not to answer.  Okay?
2        A.    Mm-hmm.
3        Q.    Okay, great.
4        A.    Yes.
5        Q.    All right.  Let's start with your full
6    name and address, please?
7        A.    Griffin Schultz, 659 Grove Street,
8    Sewickley, PA, 15143.
9        Q.    Are you employed?
10       A.    Yes.
11       Q.    By whom?
12       A.    Tiversa Corporation.
13       Q.    Just Tiversa or do you have another job
14   today?
15       A.    I have another job.
16       Q.    What's your other job?
17       A.    I'd rather not have that be in the
18   record.  Is that important.  It's publicly
19   available.
20       Q.    If it's publicly available, that's okay.
21   You can skip that.
22             You've worked for Tiversa twice if I
23   understand from the record; is that correct?
24       A.    That's correct.
25       Q.    Okay.  The first time that you worked

1    for Tiversa, when did you start working for them?
2        A.    I want to say that was -- actually, I
3    looked this morning.  December 2006 is when I
4    started with Tiversa.
5        Q.    And you started in what position?
6        A.    I can't remember my title, but I was,
7    you know, managing -- there were less than ten
8    people there at the time, so we did a lot of things.
9    But I was managing customer relationships and
10   helping build out the customer delivery process.
11       Q.    How long did you do that?
12       A.    Primarily the whole time I was there.
13       Q.    And you left when?
14       A.    I want to say it was January 2009.
15       Q.    Why did you leave?
16       A.    Bob Boback fired me.
17       Q.    Oh, he did?
18       A.    He did.
19       Q.    Did he give you a reason for that?
20       A.    Yes.  He said that I was not doing a
21   good job of communicating the value proposition to
22   our customers, and I think that was the primary
23   reason he stated.
24       Q.    At the time you left Tiversa in January
25   of 2009, were any of the employees reporting to you?

1        A.    Keith Tagliaferri may have been.
2             But again, with less than ten people
3    reporting, and the way that the company operated,
4    there weren't really formal reporting relationships.
5        Q.    Okay.  How about Mr. Richard Wallace;
6    did he report to you?
7        A.    He may have at some point.  I don't
8    recall specifically.  Or at times, I think -- what
9    would be more accurate is there might be times when
10   he or someone else might be helping on a project
11   that I was leading, and I might direct some of his
12   or other people's work associated with the project.
13       Q.    Okay.  How about the second time you
14   started working for Tiversa; when was that?
15       A.    Yeah.  So I think that was September of
16   2016.
17       Q.    How did that come about?
18       A.    So at the time Harris Jones was the
19   interim CEO.  He and I know each other personally.
20   He knew about my background at Tiversa, and
21   approached me about coming back as the CEO to see if
22   I could help the business through some challenging
23   times that it was facing.
24       Q.    Okay.  Can you be a little more specific
25   about helping the business through challenging

1    times, and I'll give you an example.
2             Was the business still soliciting
3    customers and providing services to customers?
4        A.    Yes.
5        Q.    And was that part of your
6    responsibilities, then, to continue -- to see that
7    the company continued seeking customers and
8    servicing customers?
9        A.    Yes.  Early on, but that shifted quite
10   quickly.  I would say within the first four months
11   that sort of became a difficult business strategy.
12       Q.    Why is that?
13       A.    Because of the -- the legal -- the
14   ongoing legal issues created a challenging business
15   environment to, you know, try to convince new
16   customers and existing customers to stay onboard.
17       Q.    Was the job full time for you?
18       A.    It was, yeah.
19       Q.    And it stayed full time until when?
20       A.    I can't recall -- well, at the time of
21   the sale of the asset, I became a full-time employee
22   for the acquirer; and at that point, I was part-time
23   CEO for Tiversa, and have remained that -- in that
24   capacity since then.
25             So I guess it would have been at or

1  shortly after the time of the sale of the assets.
2      Q.   And the acquirer was Kroll?
3      A.   I -- there's like a couple -- I signed a
4  contract with confidentiality.  I guess can I talk
5  about that?
6      Q.   I think it's publicly known.
7      A.   Kroll, yes.
8          MR. LOVATO:  I'll just object.  I
9  think this line of questioning is fine for
10 background purposes, but obviously, I just note that
11 we have an order limiting this to the TSA issues.
12         MR. HAWKINS:  Sure.
13         MR. LOVATO:  So long as this is
14 background information, I think we can answer some
15 of these questions, yes.
16         MR. HAWKINS:  Yes.
17     Q.   And I'm intending it only for
18 background --
19     A.   Okay.
20     Q.   -- Mr. Schultz, to get a sense of your
21 responsibilities and all of that.
22         Were you paid by acquirer after the
23 acquisition of the assets?
24     A.   Yes.
25     Q.   And you were also paid by Tiversa in the

1  part-time capacity as CEO?
2      A.   Yes.
3      Q.   Are you still being paid by Tiversa as a
4  part-time CEO?
5      A.   Yes.
6      Q.   Is that on an as-needed basis, or --
7  that is, the compensation based upon the need -- the
8  services you provide, or is there a constant,
9  steady, periodic payment?
10     A.   There's a constant, steady, periodic
11 payment.
12     Q.   Okay.  And the acquirer, are you still
13 being paid anything by the acquirer?
14     A.   No.
15     Q.   When did that stop; that is, the
16 compensation from the acquirer?
17     A.   I don't recall exactly.  I believe I
18 signed a -- an employment agreement that went for
19 six months.
20         So that would be my guess, about six
21 months from the sale of the assets.
22     Q.   Before the sale of the assets, who
23 reported to you?
24     A.   The CFO of the company, the CIO of the
25 company, and then there was a VP of business

1  development.  I think those three people reported to
2  me, if I'm not mistaken.
3      Q.   Who were those three people?
4      A.   CIO was Anju Chopra.  The VP of
5  operation -- not -- the VP of business development.
6  I can't remember his title exactly.  That was Andy
7  Tormasi.
8          And -- oh, I can't -- the CFO's name
9  is a good friend of mine and I can't think of his
10 name at the moment.
11     Q.   That's okay.  It may come to you in a
12 minute.  I'll try to remember to ask you again.
13 (Schultz Exhibit 1, Schultz affidavit, was marked
14 for identification.)
15     Q.   Let me show you an exhibit we're going
16 to mark Schultz Number 1.
17         Please take a look at that and tell
18 me whether you recognize it.
19     A.   Yes, I recognize it.
20     Q.   And this is an affidavit that you
21 signed?
22     A.   Yes.
23     Q.   Actually recently.  It was signed on
24 July 17 of 2019; correct?
25     A.   Mm-hmm.  According to this, yeah.

1      Q.   Yes.  Paragraph Number 2 says Tiversa
2  Holding Corporation, Tiversa Inc., and Tiversa
3  Government, Inc., collectively Tiversa, were sold on
4  June 6, 2017.
5          Actually, the assets were sold, not
6  the companies; correct?
7      A.   I'd have to ask our lawyer.
8          MR. LOVATO:  Objection to legal
9  conclusion.
10     Q.   Well, you're stating here --
11         MR. LOVATO:  To the extent that you
12 know, you can answer.
13     Q.   -- that it was sold, and I'm just trying
14 to figure out whether you mean that the companies
15 were actually sold or the assets, or do you know?
16     A.   I'm not sure I know.  I think I'd have
17 to ask our lawyer about the transaction.
18     Q.   Okay.  Were any assets of either of
19 these three -- excuse me.
20         Were any of the assets of any of the
21 Tiversa entities sold before the assets were sold to
22 Kroll?
23         MR. LOVATO:  Objection to form.  I
24 don't understand the question.  If you understand
25 the question, you can answer it.

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com

1    Q.   Let me strike that, then.
2         How many sales of assets have there
3    been since you became CEO of Tiversa?
4    A.   There's been -- again, I don't know if
5    they were termed asset sales or exactly what they
6    were.  We'd have to ask our attorney.  But there was
7    an asset sale to Kroll, and then we sold assets or
8    the business of corporate armor after that.
9    Q.   How about the building?
10   A.   That may have closed before I came
11   onboard, or the contract was negotiated before I
12   came onboard.  I don't -- I took no part in it.  I
13   think it was either done or just being completed
14   when I came onboard.
15   Q.   Was the building also sold to Kroll?
16   A.   My understanding is they picked up the
17   lease that we weren't paying; but again, I don't
18   remember that for sure.
19   Q.   Does Tiversa -- any of the Tiversa
20   entities have any assets today?
21   A.   We have...
22        MR. LOVATO:  I'm just going to place
23   an objection.  I'm not sure what this has to do with
24   the issues that we're here for today or background
25   information, as to his knowledge of the TSA.

1         We -- you had previously served
2    discovery regarding these issues, and we have
3    objected to it, and there is a very clear order
4    limiting this to the TSA issues.
5         MR. HAWKINS:  Right.  This is
6    background.  I'm almost done.
7         MR. VERDREAM:  I'll join.
8         MR. LOVATO:  Can you restate the
9    question?
10        MR. HAWKINS:  You can read it back,
11   please.
12   (The record was read back by the Court Reporter.)
13   A.   What would you consider an asset?
14   Q.   Bank accounts, physical items,
15   computers, backup tapes, copies of the data store;
16   things of that nature.
17   A.   We have bank accounts.  We have records,
18   electronic and paper.  I think that's all that we
19   have of assets.
20   Q.   Okay.
21   A.   And no physical space.
22   Q.   Okay.  What did you do to prepare for
23   your deposition today?
24   A.   I met with my attorneys, and I looked at
25   my LinkedIn page to see my very -- my two terms of

1    time with Tiversa.
2    Q.   Anything else?
3    A.   No.
4    Q.   Did you review any records other than
5    your LinkedIn page?
6    A.   Yes.  I looked at a couple -- well, I
7    think a contract related to this case, and maybe a
8    proposal, a few documents.
9    Q.   And you did that in preparation for
10   today's deposition?
11   A.   Yes.
12   Q.   Do you recall reviewing any other
13   documents in preparation for today's deposition?
14   A.   Yes, I reviewed what was the pretrial
15   brief, I guess, but that's -- that's it.
16        MR. LOVATO:  Just answer to the
17   extent that you remember.
18   A.   That's it.
19   Q.   Did you speak with anybody other than
20   your attorneys in preparation for today's
21   deposition?
22   A.   No.
23   Q.   Let me show you what I have marked as --
24        THE WITNESS:  Who is this new
25   person?

1         MR. HAWKINS:  Oh.  Let's go off the
2    record for a moment.
3         THE VIDEOGRAPHER:  We're going off
4    the record.  The time is 8:51 a.m.
5    (RECESS, 8:51 a.m. - 8:52 a.m.)
6         THE VIDEOGRAPHER:  We are back on
7    the record.  The time is 8:52 a.m.
8    (Schultz Exhibit 2, 30(b)(6) Notice, was marked for
9    identification.)
10   BY MR. HAWKINS:
11   Q.   Mr. Schultz, I'm handing you what I have
12   marked Schultz 2.  Please take a look at that and
13   tell me whether you have seen that before.
14   A.   Are you asking if I've seen this or I
15   know what it is?
16   Q.   First, have you seen it?
17   A.   I don't know.
18   Q.   You don't recall seeing this before?
19   A.   No.
20   Q.   Do you know what this is?
21   A.   I may have.  Looks like a Notice of
22   Deposition and then definitions of terms, topics for
23   examination.
24   Q.   That's okay.  If you're just looking at
25   it for the first time, you don't need to describe it

1  to me.
2      A.   I don't know.  I have seen a lot of
3  legal documents.  I don't know if I have seen this
4  one.  Let me grab my glasses, though.
5      Q.   Sure.
6          MR. LOVATO:  So as not to interrupt
7  the flow of the deposition, I just want to state
8  that -- on the record that we have objected to the
9  full scope of this 30(b)(6), and there is on order
10 dated June 26, 2019, limiting the scope of the
11 30(b)(6) to the TSA issues remaining in the case.
12         MR. HAWKINS:  Right.
13         MR. LOVATO:  I just don't want to
14 have to keep repeating the objection.
15         MR. HAWKINS:  We understand that.
16 Okay.
17 BY MR. HAWKINS:
18     Q.   One of the pages I think you looked at
19 was topics for examination.  Do you want to go back
20 to that, please.  And actually, my question is
21 specific to these topics.
22         Have you seen this listing of topics
23 for examination before?
24     A.   I don't know if I have seen this
25 specific one, but I think I have seen similar.

1      Q.   You think so when?
2      A.   I've just looked at so many documents.
3  I think I have seen similar, but I don't know if I
4  have seen this specific page.
5      Q.   Oh, so you may or may not; you're not
6  sure?
7      A.   I'm not sure.  Yeah.
8      Q.   All right.  Let's turn to Number 7 there
9  on that page.  It says topics for examination and
10 I'll just go ahead and read it.  Number 7 says,
11 quote, "The accuracy or lack thereof of all
12 information communicated by Tiversa to Kristen
13 Fuller, Michael Byrne, Tiffany Crowders, William
14 Greg Maier, Yague Ngom or any other employees or
15 agents of the TSA between January 1, 2010, and
16 December 31, 2013, including information contained
17 in any documents Tiversa provided to these
18 individuals," close quote.
19         Do you see that that there?
20     A.   Yes.
21     Q.   What have you done to prepare yourself
22 for answering questions on that topic?
23     A.   As I stated earlier, I generally met
24 with our attorneys.
25     Q.   Other than meeting with the attorneys.

1      A.   I don't -- nothing.
2      Q.   All right.  And Number 8 says, quote,
3  "The accuracy or lack thereof of information
4  contained in any presentations made by Tiversa to
5  Kristen Fuller, Michael Byrne, Tiffany Crowders,
6  William Greg Maier, Yague Ngom or any other
7  employees or agents of the TSA between January 1,
8  2010, and December 31, 2013," close quote.
9          Do you see that there?
10     A.   Yes.
11     Q.   Same question.  Other than speaking with
12 your attorneys, what have you done to prepare
13 yourself for answering questions on that topic?
14         MR. LOVATO:  I'm going to object
15 just based on the order to the extent it implies a
16 duty to prepare.  The order very clearly states he's
17 to testify as to his knowledge regarding this -- the
18 TSA issues, but you can answer.
19     A.   I don't think I have done anything to
20 prepare for that.
21     Q.   Yeah.  Okay.  Let's take about a
22 five-minute break.
23         THE VIDEOGRAPHER:  We're going off
24 the record.  The time is 8:57 a.m.
25 (RECESS, 8:57 a.m. - 9:03 a.m.)

1          THE VIDEOGRAPHER:  We are back on
2  the record.  The time is 9:03 a.m.
3          MR. HAWKINS:  Mr. Levato, I think I
4  need an understanding from you.  Rule 30(b)(6) of
5  the Federal Rules of Civil Procedure imposes certain
6  obligations on parties to have a designee that has
7  conducted a reasonable, diligent search for
8  information, and I take it this designee has not.  I
9  take it from your interpretation of the order that
10 you don't believe that Tiversa, any of the Tiversa
11 entities have that obligation.  Am I correct on
12 that?
13         MR. LOVATO:  I think the
14 interpretation of the order is consistent with all
15 of the prior orders in this case.  Mr. Schultz is
16 the only employee.  There's a clear order that says
17 that Tiversa did not have to go to other employees
18 to -- former employees to gather information.
19         So in his role as the only employee,
20 he has assisted in preparing document responses and
21 responses to the questions and the interrogatories
22 in this matter.  And in that vein, he is prepared to
23 answer the questions.
24         But in terms of trying to impose a
25 duty to go to former employees, which has already

1    been struck down by the court, we did not -- he did
2    not do that.
3              MR. HAWKINS:  Okay.
4              MR. LOVATO:  Nor is he required to
5    do so.
6              MR. HAWKINS:  I didn't say anything
7    about former employees.
8              MR. LOVATO:  Well, I think it goes
9    to the scope of the investigation that you're
10   implying he has, and I think the court very clearly
11   states that he did not have a duty to do that.  He
12   has assisted, as the only employee, in preparing the
13   discovery responses.
14             So he is knowledgeable to that
15   extent.
16   (Schultz Exhibit 3, typed notes, TIVSDNY - 008373,
17   was marked for identification.)
18   Q.    Mr. Schultz, I'm handing you what has
19   been marked Schultz 3.  Please take a look at that
20   and tell me whether you have ever seen that before.
21   A.    I don't recall ever seeing this before.
22   Q.    And this is not a document that you've
23   reviewed in preparation for your deposition today;
24   correct?
25   A.    No.

1    (Schultz Exhibit 4, Tiversa P2P statement of work,
2    4.2010, TIVSDNY - 0053835400, was marked for
3    identification.)
4    Q.    I'm going to show you a document I've
5    marked Schultz 4.  Please take a look at that and
6    tell me whether you recognize that.
7    A.    I don't think I've ever seen this
8    specific document.  I don't recall ever seeing this
9    specific document, but I've seen documents similar
10   to this produced by Tiversa.
11   Q.    Let me turn to the third page, the one
12   that has the Bates Number at the bottom,
13   TIVSDNY-5385, third paragraph there, let me reed
14   that.  It says, "Tiversa's unique value is in its
15   privileged position to see and access the entire WW
16   P2P in realtime."
17             Do you see that there?
18   A.    Yes.
19   Q.    Is that true or false?
20             MR. LOVATO:  Objection, legal
21   conclusion.  You can answer if you know.
22             MR. HAWKINS:  Just for the record,
23   questions that call for legal conclusions I don't
24   consider to be form related.  So you don't have to
25   make that objection.

1              MR. LOVATO:  Okay.
2              MR. VERDREAM:  Jim, could I bother
3    you to -- I have TIVSDNY-007785 as my first page.
4              MR. HAWKINS:  Let me see.
5              MR. LOVATO:  Sorry.  I had written
6    Schultz on this.
7              MR. HAWKINS:  I'll have to get you
8    another one.
9              MR. VERDREAM:  That's okay.  Can you
10   just tell me the Bates Numbers for that first
11   Schultz 3?
12             MR. HAWKINS:  Yes.  5383.
13   TIVSDNY-005383.
14             MR. VERDREAM:  To what; what's
15   the --
16             MR. HAWKINS:  To 5400.
17             MR. VERDREAM:  Thank you.
18   BY MR. HAWKINS:
19   Q.    Okay.  My question was whether that
20   sentence is true or false.
21   A.    I don't -- I'm not sure.  I think -- I
22   think we'd have to ask Anju Chopra or Sam Hopkins or
23   someone with a more technical background.  But yeah,
24   generally, I think we could access the entire peer
25   to peer.  I don't know if that was true -- this was

1    created in 2010.  I'm not sure.  I was not at the
2    company then, but...
3              MR. LOVATO:  I'd object to the all
4    at once, because I don't think that's what the
5    sentence says.
6    A.    Yeah, and in the next sentence, just
7    like Google doesn't do it all at once.  Google
8    crawls the web.  Again I'm not an expert.  But my
9    understanding, as a non-technical expert, is Google
10   crawls the web, and over time, you know, but it's
11   crawling in realtime, just as my understanding is of
12   what we would do.
13   Q.    One of the sentences in that paragraph
14   says, quote, "As such, Tiversa has the ability to
15   detect and record all user issued, P2P searches,
16   access and download all files available on the WW
17   P2P networks, determine the actual disclosure source
18   of documents, track the spread of files across the
19   entire WW P2P networks and remediate any P2P file
20   disclosure," close quote.  Is that correct?
21             MR. VERDREAM:  Object to form.
22   Q.    Was that ever correct to your knowledge?
23             MR. LOVATO:  Same objection.
24   A.    Yeah.  I don't know.  I guess from a
25   legal standpoint, we'd have to ask more technical,

Page 30

1  you know, people at the company.
2      Q.   Is that a technical issue or a legal
3  issue?  In your mind?
4      A.   Well, you're asking me a pretty detailed
5  legal question.  I wouldn't want to, you know -- I
6  don't think I'm the right person to ask that
7  question.
8      Q.   Okay.
9      A.   I understood we had the ability to do
10 this, yeah.
11     Q.   To do what?
12     A.   What we're saying in this paragraph.
13     Q.   Okay.  Next paragraph, the first
14 sentence says, quote, "While an individual using a
15 P2P application can typically connect to no more
16 than 3,125 other users, Tiversa's patented systems
17 can connect to all P2P users, paren, typically, 20
18 million users at any one time, close paren, in
19 realtime, 24 by 7 by 365," close quote.
20          Was that true or false in 2010?
21     A.   I think my answer to that is no
22 different than the previous two paragraphs.
23     Q.   I don't -- well, I need to get an answer
24 from you on that particular question.  The question
25 pertaining to that particular statement.

Page 31

1      A.   Oh, if -- I was not at the company in
2  2010, so I can't -- I don't think I can comment on
3  that, even as a -- what is it 30B representative.
4      Q.   How about in -- how about before you
5  left; was that true before you left?
6      A.   Yeah, again.  I don't know.  I would
7  assume that it...
8      Q.   Don't make any assumptions.  If you
9  don't know --
10     A.   I don't...
11     Q.   You don't know?
12     A.   (Witness shakes head back and forth.)
13          Things had changed by the time that
14 I arrived.  Much of the focus of the business was
15 on -- not all, but much of it was consumer focussed.
16 We were looking at things and collecting information
17 outside the P2P.
18          So again, things had changed.
19 Again, I think we would be better off asking, you
20 know, more technical folks at the company.
21     Q.   Were you talking about when you returned
22 as CEO?
23     A.   Yeah.
24     Q.   Okay.  The next sentence says, quote,
25 "Due diligence performed by various government

Page 32

1  agencies, law enforcement, strategic partners,
2  current enterprise level customers, industry
3  leaders, and extensive patent searches in support of
4  Tiversa's patents have all confirmed that Tiversa is
5  the only firm to possess these capabilities."
6  Period, close quote.
7          Was that true at the time you left
8  the company in 2009?
9      A.   This was published after I left the
10 company in 2009.
11     Q.   That's correct.  But the statement,
12 then, would that have been true before you left?
13     A.   I don't know.  I don't know that I would
14 have had the scope of knowledge about what had been
15 done previous to me coming onboard.  I didn't do any
16 of this, but I would -- I would assume it to be
17 true, yeah.
18     Q.   Do you know whether this Exhibit,
19 Schultz 4, was provided to the TSA?
20     A.   I don't know.
21          MR. VERDREAM:  Sorry, Jim, that's
22 Schultz 3; right?
23          THE WITNESS:  Mine says Schultz 4.
24          MR. VERDREAM:  Oh, you're right.
25 I'm sorry.  Yes, you're right.

Page 33

1  (Schultz Exhibit 5, Proposed Services, TSA, 5.2010,
2  TIVSDNY - 007785-7792, was marked for
3  identification.)
4      Q.   Showing you what I've marked Schultz 5.
5          Please take a look at that and tell
6  me whether you have seen it.  It says on the cover,
7  proposed services prepared for the Transportation
8  Security Administration and it has a May 2010 date
9  on it.  Have you seen this before?
10     A.   I don't recall seeing this document
11 before.
12     Q.   Do you know whether this document was
13 presented to the TSA at any time?
14     A.   I don't know if it was.
15     Q.   Do you know if Tiversa provided takedown
16 services as part of its contract with the TSA?
17          MR. VERDREAM:  Object to form.
18          MR. LOVATO:  Object to form.
19     A.   I don't know if it provided takedown
20 services.
21     Q.   Do you know if the contract called for
22 takedown services?
23     A.   I don't know if the contract called for
24 takedown services.
25     Q.   Why don't you tell us what takedown

9 (Pages 30 to 33)

Page 34

1    services are.  Other people will be reading this
2    transcript.  You and I may know what that is, but
3    just so other people know.
4         A.    My recollection of takedown services
5    dates back to my previous time so I -- I don't -- my
6    understanding of what takedown services were, was
7    that if -- and this was available, I think, to
8    anyone, not our company.
9              If one were to come to understand
10   that an IP address was disclosing information that
11   was proprietary, should not be disclosed, I believe
12   you could send a takedown request to the ISP
13   provider, and note information about that content,
14   and have -- I think there's an obligation of the ISP
15   to communicate that to the end user, or somehow take
16   that down.  That's my understanding.
17        Q.    Was that done at Tiversa when you were
18   there the first time?
19        A.    I don't recall.  I don't ever recall
20   doing that.  But I know we talked about and offered
21   it.  It may have.  We may have done that.
22   (Schultz Exhibit 6, Peer to Peer Monitoring and
23   Detection Services, TIVSDNY - 007456-7457, was
24   marked for identification.)
25        Q.    Let me show you Schultz 6.

Page 35

1              MR. LOVATO:  Did you give me one?
2    Did I miss it?
3         Q.    This is a document that's got at the top
4    peer to peer monitoring and detection services.  As
5    a --
6         A.    Well, before you go through it, just to
7    the other -- I don't think I have seen this before.
8         Q.    Okay.
9         A.    You didn't ask that question, but it
10   seems to be a general one.
11        Q.    Yeah, but let me get on the record what
12   the document is.
13        A.    Okay.  All right.
14        Q.    The document says on it, solicitation
15   number HSTS03-11-R-CIO554.  Having said that, my
16   question is, have you seen this document before?
17        A.    No, I have not.  I don't recall seeing
18   this document before.
19        Q.    Do you know what it is?
20        A.    My interpretation of it is that it looks
21   like it's a notice from the Department of Homeland
22   Security, you know, looking for -- inviting
23   proposals, I think, for peer to peer monitoring.
24        Q.    Okay.  Thank you.
25        A.    But I'm not certain of that.  That's

Page 36

1    just my cursory review.
2    (Schultz Exhibit 7, Pilot Program P2P Vulnerability
3    Assessment, June 2010, TIVSDNY - 00643-6661, was
4    marked for identification.)
5         Q.    Let me show you what I have marked
6    Schultz 7.
7              Please take a look at that and tell
8    me whether you have seen that before.
9              I'll note for the record that the
10   document on the front says, pilot program-P2P
11   vulnerability assessment services, statement of work
12   prepared for the Department of Homeland Security
13   Office of Inspector General, with the date on it of
14   June 2010.
15        A.    I don't think I have seen this specific
16   document before.
17        Q.    Do you know what it is?
18        A.    It looks like -- it looks like a
19   Tiversa-prepared statement of work describing what
20   would be done for the Department of Homeland
21   Security.
22        Q.    Do you know if this document was
23   provided to the Department of Homeland Security?
24        A.    I don't know.
25        Q.    How would you find out?

Page 37

1         A.    What's that?
2         Q.    How would you find out?
3         A.    I guess we might -- there might be an
4    outgoing e-mail that might have this as an
5    attachment.
6         Q.    Have you looked for that, or to your
7    knowledge has anybody looked for that?
8              THE WITNESS:  Can I talk about
9    discovery.
10             MR. LOVATO:  He asked to your
11   knowledge whether --
12        A.    Yes, to my knowledge, people have looked
13   for that.
14        Q.    People have, but not you?
15        A.    I'm not an expert in sifting through
16   large volumes of e-mail to find this information.
17   No.
18        Q.    I see.
19        A.    But I have assisted and, you know,
20   directed, based on requests like that.
21             MR. LOVATO:  Can we go off the
22   record just for a second.
23             THE VIDEOGRAPHER:  Going off the
24   record.  The time is 9:19 a.m.
25   (RECESS, 9:20 a.m. - 9:20 a.m.)

10  (Pages 34 to 37)

1    THE VIDEOGRAPHER:  We are back on
2 the record.  The time is 9:20 a.m.
3 (Schultz Exhibit 8, Proposal, Federal Breach
4 Protection, July 2011, TIVSDNY - 007574-7584, was
5 marked for identification.)
6 BY MR. HAWKINS:
7    Q.   Mr. Schultz, I'm handing you Schultz 8.
8 Please take a look at that and tell me whether you
9 have ever seen that before.
10    A.   No, I have not seen this document, but
11 again, I have seen documents similar to these.
12    Q.   Do you understand that this was a
13 document prepared by Tiversa in response to
14 solicitation HSTS03-11-Q-CI0554?
15    A.   Only because it says that, yes.
16    Q.   Do you know whether this document was
17 ever presented to the TSA?
18    A.   I don't know.
19    Q.   How would you find out?
20    A.   Similar.  I think we would look through
21 e-mail communications.
22    Q.   And you've not done that for this
23 particular document; correct?
24    A.   I have not personally.
25 (Schultz Exhibit 9, Statement of Work, Federal Break

1 Protection, July 2011, TIVSDNY - 007386-7397, was
2 marked for identification.)
3    Q.   Let me show you Schultz 9.  This is a
4 document on the front says statement of work
5 prepared for the Transportation Security
6 Administration, July 2011.
7    Have you seen this document before?
8    A.   No.
9    Q.   Do you know whether this document was
10 ever given to the TSA?
11    A.   I don't know.
12    Q.   And how would you find out?
13    A.   Answer -- same answer to the previous
14 questions.
15 (Schultz Exhibit 10, P2P Monitoring & Forensic
16 Investigation Services, Naval Air Command, 2010,
17 TIVSDNY - 009104-9121, was marked for
18 identification.)
19    Q.   Let me show you Schultz 10.  This is a
20 document that on the front says P2P monitoring
21 forensic investigation services, prepared for the
22 Naval Air Command to provide professional services
23 to the Transportation Security Administration.
24    Have you ever seen this document
25 before?

1    A.   No, not that I recall.
2    Q.   Do you know whether this document was
3 ever given to the TSA?
4    A.   I don't know.
5 (Schultz Exhibit 11, TSA Kickoff Discussion, August
6 2011, TIVSDNY - 009603-9637, was marked for
7 identification.)
8    Q.   Let me show you Schultz 11.  Please take
9 a look at that and tell me if you have ever seen
10 that before.
11    A.   I don't believe I have ever seen this
12 document before.
13    Q.   Do you know whether that document was
14 ever given to the Transportation Security
15 Administration?
16    A.   I do not know.
17    Q.   Let me show you Exhibit Schultz 12.
18 (Schultz Exhibit 12, Tiversa customer tickets,
19 TSA0002 [several pages], was marked for
20 identification.)
21    Q.   I'll represent to you that this is a
22 portion of a collection of tickets that were
23 produced to us in the litigation.  I just want to
24 know whether you have ever seen that before.
25    MR. LOVATO:  Object to form.  Are

1 you asking about the particular ticket or the form?
2    MR. HAWKINS:  That's a good
3 question.
4    Q.   First, let's talk about the form.
5    Do you recognize the form of what
6 I've given to you as Schultz --
7    A.   When you say the form, you mean the
8 format --
9    Q.   -- 12?
10    A.   -- does this look like --
11    Q.   Yes.
12    A.   -- a document that I have interacted
13 with before, seen before?
14    Q.   Correct.
15    A.   Generally; but again, it would have been
16 in my previous time at Tiversa, which was a long
17 time ago when these things evolved.
18    But generally, I'm comfortable with
19 this form, yeah.
20    Q.   You're comfortable with it?
21    A.   I guess I generally understand what this
22 document is --
23    Q.   Okay.
24    A.   -- in trying to --
25    Q.   Thank you.  Have you ever seen this

1  particular document that I provided to you, Schultz
2  12?
3       A.   Not that I recall.
4       Q.   Do you know whether this particular
5  document or any parts of it were ever given to the
6  TSA?
7            MR. LOVATO:  Not an objection.  You
8  said 12.  I have -- oh, Schultz.  I'm sorry.  I'm
9  reading the Bates label.  Strike that.
10      A.   I don't know if this was shared with
11 TSA.
12      Q.   In Section 7 on the second page there,
13 it's the section that's headed takedown request, and
14 the first bullet point says, "Takedown request,
15 paren, takedown request issued to the ISP hosting
16 the disclosure source IP address."  Close quote.
17           Do you see that there?
18      A.   Yes.
19      Q.   Do you know whether Tiversa ever
20 actually performed any takedown requests for the
21 TSA?
22      A.   I don't know whether they did or did
23 not.
24      Q.   Have you checked -- done anything to
25 check to determine whether that occurred or not?

1       A.   No.
2            Other than be, again, responsive to
3  all discovery requests from government agencies,
4  lawyers, anybody that has asked us to produce
5  information relevant to the TSA relationship.
6       Q.   Have you looked for any takedown
7  requests for this particular case?
8       A.   No, other than generally -- I have not
9  specifically looked -- I personally have not
10 specifically looked for takedown requests; but I
11 have generally, as has the company, been responsive
12 in trying to find all information related to this
13 case.
14      Q.   I understand that.  I'm just trying to
15 figure out whether you've had anything to do with
16 either looking for or seeing or being aware of
17 takedown requests in connection with the TSA
18 contract?
19      A.   Not specifically.
20 (Schultz Exhibit 13, June 2012 Report, TSA, [no
21 Bates], was marked for identification.)
22      Q.   I show you Schultz 13.  This is a
23 document that on the front says June 2012 report,
24 Tiversa federal breach protection prepared for
25 Transportation Security Administration.

1            Have you ever seen this document
2  before?
3       A.   No, but I --
4            MR. LOVATO:  Same objection as to
5  whether you're referring to the particular document
6  or the form.
7            MR. HAWKINS:  The particular
8  document here.
9       A.   I don't think I've seen this particular
10 document before.
11      Q.   Have you seen this form before?
12      A.   Again, same -- similar to my other -- I
13 generally remember quarterly, annual reports that
14 were created by Tiversa, and this looks generally
15 similar to that form.
16      Q.   Do you have any awareness of the
17 information contained in the report?
18      A.   I have some general awareness, yes.
19      Q.   General awareness of the specific
20 information, or just general information?
21      A.   General information, based more on the
22 form.
23      Q.   Okay.
24      A.   Like, what we would fill in, you know,
25 in certain areas of this type of report.

1       Q.   Let me show you Schultz 14.
2  (Schultz Exhibit 14, Tiversa Web Monitoring
3  Overview, TIVSDNY - 006034-6038, was marked for
4  identification.)
5       Q.   This is a document that's marked Tiversa
6  web monitoring overview, comprehensive web
7  monitoring and intelligence services.
8            Have you ever seen this form before?
9       A.   This form looks less familiar to me.
10 But I -- you know, I -- you know, I can understand a
11 web monitoring overview, yeah.
12      Q.   Do you know whether this document was
13 ever given to the TSA?
14      A.   I don't know.
15      Q.   Let me go back to Exhibit 13, Schultz
16 13.
17           Do you know whether that document
18 was ever given to the TSA?
19      A.   I don't know.
20 (Schultz Exhibit 15, Data Feed Solutions Overview,
21 TIVSDNY - 006028-6032, was marked for
22 identification.)
23      Q.   I'm going to show you Schultz Exhibit
24 15.  This is a document, Tiversa document that says
25 data feed solutions overview, comprehensive data

12  (Pages 42 to 45)

Page 46

```
 1   feed and intelligence services.
 2        Q.   Do you know -- have you ever seen
 3   this document before?
 4        A.   No.
 5        Q.   Either the form or this particular one?
 6        A.   Again, this form is less familiar to me.
 7   This looks like information -- forms that were
 8   created, you know, at a time that I was not there.
 9   They're less familiar; though, again, I generally
10   understand what they're trying to convey.
11        Q.   Do you know whether this document was
12   ever given to the TSA?
13        A.   I don't know.
14   (Schultz Exhibit 16, Leveraging P2P
15   Cyberintelligence, TIVSDNY - 006236-6261, was marked
16   for identification.)
17        Q.   I'm handing you a document I have marked
18   Schultz 16.  Please take a look at that and tell me
19   whether you have ever seen that before.  This is a
20   Tiversa document that says on the front, Leveraging
21   P2P Cyberintelligence, Quantifying Risk, Protecting
22   Assets and Collecting Mission Critical Cyberintel.
23        Have you ever seen this before?
24        A.   No.
25        Q.   Do you know whether this was provided to
```

Page 47

```
 1   the TSA?
 2        A.   I do not know.
 3   (Schultz Exhibit 17, P2P Monitoring Overview,
 4   TIVSDNY - 0077937796, was marked for
 5   identification.)
 6        Q.   I'm going to show you Schultz 17.  It's
 7   a Tiversa document titled P2P monitoring overview.
 8        Have you ever seen this document
 9   before?
10        A.   No.
11        Q.   Do you know whether this document was
12   given to the TSA?
13        A.   I don't know.
14        Q.   Let me show you Schultz --
15        A.   And again, this form looks less familiar
16   to me.
17        Q.   Does that mean it doesn't look familiar
18   to you?
19        A.   Does not look familiar.  Again, this
20   looks like stuff that was produced later when -- you
21   know, in the gap time that I was not there.
22        Q.   Okay.
23   (Schultz Exhibit 18, Tiversa Company Background,
24   TIVSDNY - 007371-7373, was marked for
25   identification.)
```

Page 48

```
 1        Q.   Let me show you Schultz 18.
 2        Do you recognize this document?
 3   It's a document that looks like Tiversa document
 4   that says at the top, Tiversa company background.
 5        A.   I'm not familiar with this document.
 6   I've not seen this document before, to the best of
 7   my recollection.
 8        Q.   Do you know whether that document was
 9   provided to the TSA?
10        A.   I don't know if it was provided to the
11   TSA.
12   (Schultz Exhibit 19, Executive Summary, TIVSDNY -
13   007329-7338, was marked for identification.)
14        Q.   I'm going to show you Schultz 19.
15        A.   What does this marking in the lower
16   right?  Is that --
17        Q.   Oh, that's what we call --
18             MR. LOVATO:  That's a Bates label.
19        Q.   Yeah.
20        A.   Okay.
21        Q.   You can ask your lawyer about that
22   during a break, if you want more detail.
23        Okay.  I've just handed you Schultz
24   19.  This is a Tiversa document titled executive
25   summary.  Have you seen this before?
```

Page 49

```
 1             MR. LOVATO:  I don't think you
 2   handed anyone else 19.
 3             MR. HAWKINS:  I'm sorry?
 4             MR. LOVATO:  I don't think you
 5   handed --
 6             MR. DAUGHERTY:  You haven't
 7   distributed.
 8             MR. LOVATO:  Okay.
 9             MR. VERDREAM:  Thank you.
10   BY MR. HAWKINS:
11        A.   What's the question?
12        Q.   Do you recognize this document?
13        A.   The form of it -- again, it looks less
14   familiar to me, but I generally understand what it's
15   trying to convey.
16        Q.   Do you know whether this document was
17   ever given to the TSA?
18        A.   I don't know.
19   (Schultz Exhibit 20, Overview, Background P2P
20   Networks... TIVSDNY - 008263-8273, was marked for
21   identification.)
22        Q.   Let me show you Schultz 20.  This is a
23   document at the top that says Overview.
24        Do you recognize this document?
25        A.   I don't think I've ever seen this
```

13  (Pages 46 to 49)

1  document before; and again, the form looks sort of
2  different, but generally similar to what I've seen
3  Tiversa deliver before.
4      Q.    Do you know whether Tiversa ever
5  conducted over 1.5 billion searches per day?
6             MR. VERDREAM:  Object to form.
7             MR. LOVATO:  Object to form.  To the
8  extent it misrepresents the document.
9      Q.    I wasn't referring to the document.  I
10 was just asking you whether Tiversa ever conducted
11 over 1.5 billion searches per day.  Do you know?
12     A.    This sentence says that there's 1.5
13 billion searches today on the peer to peer networks.
14     Q.    My question is not related to the
15 document.  My question is just, do you know whether
16 Tiversa ever conducted 1.5 billion searches a day?
17     A.    I don't know if we conducted 1.5.
18     Q.    Did Tiversa ever have that capability to
19 your knowledge?
20     A.    I think we would have to ask Sam Hopkins
21 or Anju Chopra or someone...
22             MR. VERDREAM:  Object to the form on
23 those questions.
24             MR. LOVATO:  Join.
25 (Schultz Exhibit 21, Overview, Background P2P

1  Networks... TIVSDNY - 008356-8366, was marked for
2  identification.)
3      Q.    Let me show you Schultz 21, which looks
4  like the last document, but it's actually a bit
5  different.  It's a document that starts off at the
6  top, overview, background, P2P networks,
7  intelligence and security.
8             My question is whether you have ever
9  seen that before?
10     A.    I don't think I've ever seen this
11 before.
12     Q.    Do you know whether that document was
13 provided to the TSA?
14     A.    I don't know.
15 (Schultz Exhibit 22, File Takedown Services, TIVSDNY
16 - 00652-8654, was marked for identification.)
17     Q.    Let me show you Schultz 22, a document
18 at the top that says, file takedown services.
19             Have you ever seen this document
20 before?
21     A.    I don't recall seeing this before.
22     Q.    Do you know whether this document was
23 provided to the TSA?
24     A.    I don't know.
25     Q.    Do you know whether Tiversa ever

1  modified or altered the timestamps on any of the
2  files that it provided to the TSA; that is, the
3  files that it claimed to have found on P2P networks?
4             MR. VERDREAM:  Object to form.
5             MR. LOVATO:  Object to form.
6      A.    Sorry.  Could you repeat the question?
7      Q.    Yes.
8             Do you know whether Tiversa ever
9  modified or altered the time -- let me back up,
10 actually.
11             When I say timestamp on a document,
12 do you know what that means?
13     A.    No, not per your question.
14     Q.    Do you know what create date means?
15     A.    In metafile -- or in the --
16     Q.    Metadata, yes.
17     A.    -- metadata of a file?
18     Q.    Yes.
19     A.    Yes.
20     Q.    Generally.  What does that mean?
21     A.    I'm not an expert on metadata, but
22 usually it's the date that the document was created.
23     Q.    Okay.  And if a document was downloaded
24 from a P2P network at Tiversa, would it show a
25 created date on the date of download?

1      A.    It varied because not all files have
2  metadata like that.
3      Q.    Did Tiversa maintain metadata on files;
4  that is, not the file metadata but Tiversa's own
5  metadata about, for example, when it downloaded the
6  document?
7             MR. LOVATO:  Object to form.
8             MR. VERDREAM:  Join.
9             MR. LOVATO:  You can answer.
10     A.    You mean about when we downloaded it?
11     Q.    Yeah.  Let me strike all of that.
12     A.    Yeah.
13     Q.    How would we know what date Tiversa
14 downloaded a document from a P2P network?
15     A.    I believe we logged that information,
16 yeah.
17     Q.    And it was logged how?
18     A.    I -- again, we would -- we should ask
19 more technical folks that dealt with this thing, but
20 I believe there was a log in the SQL database.
21     Q.    Do you know what the title of the field
22 was, or the column?
23     A.    I don't.
24     Q.    Would that have been a create date or
25 modified date?

14  (Pages 50 to 53)

Page 54

```
1         A.    I don't know.
2         Q.    Do you know whether anybody ever altered
3    any of those dates?
4              MR. VERDREAM:  Object to form.
5              MR. LOVATO:  Join.
6         A.    I don't know that anybody altered those
7    dates.
8         Q.    Do you know whether Rick Wallace ever
9    altered any dates for files in the data store?
10        A.    I don't know that Rick Wallace changed
11   any information, but I do know that he has testimony
12   suggesting something to that effect.
13        Q.    Setting aside his testimony, did you
14   ever suspect that he may have been altering dates?
15        A.    No.
16        Q.    How would we go about determining
17   whether dates in the data store have been modified
18   or altered?
19        A.    Again, not being the IT person that
20   built, maintained those systems, I would not know.
21        Q.    Do you think that could be done today?
22             MR. VERDREAM:  Object to form.
23             MR. LOVATO:  Join.
24        A.    Could you repeat the question.
25             MR. HAWKINS:  Could you read the
```

Page 55

```
1    question back, please.  Actually, it's two questions
2    ago.
3    (The record was read back by the Court Reporter.)
4         A.    Again, I don't have the technical
5    expertise to say whether it could be done today.
6         Q.    You don't know one way or the other?
7         A.    I don't.
8              MR. LOVATO:  Could we take five?
9              MR. HAWKINS:  Sure.
10             THE VIDEOGRAPHER:  We're going off
11   the record.  The time is 9:40 a.m.
12   (RECESS, 9:40 a.m. - 9:49 a.m.)
13             THE VIDEOGRAPHER:  We are back on
14   the record.  The time is 9:49 a.m.
15   BY MR. HAWKINS:
16        Q.    Mr. Schultz, do you know who were the
17   representatives of the Transportation Security
18   Administration with whom Tiversa employees met
19   before the contract was entered into.
20        A.    No.
21        Q.    Do you know which Tiversa employees met
22   with representatives of the Transportation Security
23   Administration before the contract was entered into?
24        A.    No.
25        Q.    Do you know who was responsible for
```

Page 56

```
1    carrying out the contract with the TSA?
2         A.    Generally.  I believe that to be -- it
3    was sort of a distributed team, but it would have
4    been folks like Andy Tormasi, Mike Carulli and then
5    there were probably -- again, this was a time that I
6    was not the CEO, but there probably would have been
7    other people in similar roles as Mike Carulli that
8    would collect information on customers and share
9    that.
10        Q.    When was the last time you spoke with
11   Mike Carulli?
12        A.    Oh, gosh.  At least six months and maybe
13   longer.  It might have been as far ago as my
14   departure from Kroll.
15        Q.    Okay.  And when was that?  Maybe you
16   told me earlier.
17        A.    Back to like six months after June of --
18   so what's that, early 2018, I guess.
19   January/February 2018.
20        Q.    Did any of the Tiversa employees go with
21   the assets to Kroll?
22        A.    Yes.  I believe everyone except my good
23   friend and CFO whose name I can't recall.
24        Q.    We'll give you one more try.
25              You said everyone?
```

Page 57

```
1         A.    I believe so.  There were less than ten
2    of us at the time.
3         Q.    Can you recall who they were?
4         A.    Trying to think in the office there.
5              So myself, Andy Tormasi,
6    Mike Carulli, Ray Richards.  There might have been
7    one other ops person, but I don't think so.  Glenn
8    Crilley, Anju Chopra.  We had maybe one or two other
9    software dev -- I can't remember if they were
10   consultants or full time, so that would approximate
11   everyone.
12        Q.    Are they all still there at Kroll?
13        A.    I don't know who's there and who's not.
14   I don't know.  I think Andy may still be there, Anju
15   and Mike.  Beyond that, I'm not sure.
16        Q.    Does Tiversa have the ability to access
17   any of the data in its data store today?
18             MR. VERDREAM:  Object to form.
19             MR. LOVATO:  Object to form.
20        A.    No.  It's not our data store --
21        Q.    No copy was kept?
22        A.    -- anymore.  No.
23        Q.    Was any related data kept?
24        A.    I don't -- to make a copy of that, I
25   don't even know.  We should ask tech -- I don't even
```

15 (Pages 54 to 57)

Page 58

1    know if that's -- it's huge.
2        Q.    Did the contract in the asset sale
3    account for Tiversa still having access to any of
4    the information in the data store?
5        A.    I don't know.  We'd have to ask --
6    sorry.
7              MR. LOVATO:  I'll just object to the
8    form, but go ahead.
9              MR. VERDREAM:  Join.
10       A.    Yeah.  I don't know, but maybe our
11   corporate attorney might know that.
12       Q.    Our corporate attorney?
13       A.    Yeah.
14       Q.    That is who?
15       A.    Pepper Hamilton.
16       Q.    Eric Kline in particular?
17       A.    It -- we use various attorneys over
18   there.  Primarily Eric.
19       Q.    Okay.
20             Do you know any of the
21   representations that were made by any of the Tiversa
22   people to any of the TSA people before the contract
23   was entered into?
24       A.    I'm sorry.  Could you repeat that again.
25       Q.    Sure.  It's a broad question.

Page 59

1        A.    Yeah.
2        Q.    Do you know of any of the
3    representations that were made by any of the Tiversa
4    people to any of the TSA employees before the
5    definitive contract was entered that?
6              MR. LOVATO:  Object to form.  Go
7    ahead.
8        A.    No.
9        Q.    How would you find out?
10       A.    How would I find out?
11       Q.    Yes.
12       A.    I guess we would look at the corporate
13   records that we have to see if there was any
14   communication or e-mail.
15       Q.    Okay.  Anything else?
16       A.    Well, not -- going out -- is this the
17   order of the court was based on the knowledge that I
18   have, and the resources and assets of the company
19   today?
20             MR. LOVATO:  Well, I think you can
21   answer the question, subject to --
22             THE WITNESS:  I guess we'd ask --
23             MR. LOVATO:  We produced documents
24   in discovery.
25             THE WITNESS:  Yeah.  Given the

Page 60

1    access to Tiversa assets and people, which there are
2    none today, we would do, you know, discovery on our
3    documents and communications.
4    BY MR. HAWKINS:
5        Q.    Have you ever heard of the File Renamer
6    tool?
7        A.    Yes, but I can't recall if I know that
8    because of conversations with attorneys or
9    independent.
10       Q.    Okay.  What about burnt IP addresses;
11   have you ever heard that phrase before?
12       A.    My recollection is I had never heard
13   that phrase until maybe -- again, reading -- might
14   have been Rick Wallace's -- a deposition in one of
15   the various cases; but I think independent of that,
16   I don't think I had ever heard that term.
17       Q.    Go back to Schultz 2, please.
18       A.    Unfortunately, I go from Schultz 1 to
19   Schultz 3.  Oh, oh.  Is this the -- I think I'm
20   holding it in front of me.  Is this Schultz 2?
21       Q.    Yes.
22       A.    Yes.
23       Q.    Specifically I want you to go to Exhibit
24   A, which is about the 10th or 12th page, I think.
25       A.    This number 10?

Page 61

1        Q.    No, no.  Back up a few pages.
2        A.    Exhibit A.
3        Q.    That's right.  Exhibit A.  Exhibit A
4    that's attached to Schultz 2 is titled, affidavit in
5    support of an application under Rule 41 for a
6    warrant to search and seize.
7              Have you ever seen this document
8    before?
9        A.    Is this the search warrant?
10       Q.    Yes.
11             No.  This is an affidavit.
12       A.    You don't think I -- I'm not certain if
13   I've seen this.  I don't think I have.
14             I know I have seen the search
15   warrant, I don't know -- I think I have seen the
16   search warrant.  I'm not sure if I have seen this.
17       Q.    Did you ever talk to the FBI?
18       A.    Yes.
19       Q.    Did you ever talk to any other agencies
20   of the U.S. government?
21             MR. LOVATO:  Object as it's beyond
22   the scope of the deposition.
23             MR. HAWKINS:  It may or may not be.
24             MR. VERDREAM:  Object to form.
25   Join.

16  (Pages 58 to 61)

Page 62

```
 1              MR. LOVATO:  It is.
 2          You can answer the question, but
 3   we'll be -- we'll tread lightly.  Go ahead.
 4      A.   So we fully cooperated with the
 5   Department of Justice based on two offices that we
 6   understood were investigating matters.  One was in
 7   Washington, D.C., and one was the Southern District
 8   of New York.
 9          So we invited them to our -- we
10   fully cooperated.  We invited them to our offices
11   and I met with -- and others at the company -- both
12   joint around the table like this, and then
13   individually, and we allowed them access to our
14   systems, the operations room, and there were various
15   DOJ and FBI officials there.  I can't remember
16   exactly who.  I have some recollection of who was
17   there.
18          So that's my -- I don't know if that
19   was the only interaction.  You know, and then a lot
20   of discovery through lawyers.
21      Q.   Was one of the individuals a fellow
22   named J.D. Barnea?
23      A.   I believe, yes.
24      Q.   And he is an attorney in the U.S.
25   Attorneys Office in the Southern District of New
```

Page 63

```
 1   York.  Is that your understanding?
 2      A.   That's my understanding.
 3      Q.   And you had conversations with him with
 4   the TSA contract?
 5      A.   I don't remember that day.  I can
 6   describe the information that we went through.
 7      Q.   Please.
 8      A.   But I don't remember there being
 9   specific questions around that.  There may have
10   been.
11      Q.   Okay.  So please describe the
12   information that you went through.
13      A.   Excuse me.  My phone ringing.
14              MR. VERDREAM:  Object to form.
15              MR. LOVATO:  Join.
16      A.   So we were fully cooperating with the
17   investigations.  So in addition to providing
18   discovery -- not -- I don't think at that point it
19   was discovery; it was just -- this was, again, after
20   the FBI, I guess -- is the right term raid?  Raided
21   the office, which I was not at the company then.
22          When I came back, we invited the DOJ
23   and FBI.  I don't think it was a request.  I think
24   we invited them voluntarily to come up.
25          We gave them a general overview via
```

Page 64

```
 1   PowerPoint of our business and what we did.  We had
 2   all of the employees in the room with about -- I'm
 3   going to guess five to ten DOJ and FBI officials.
 4          We walked them through our business
 5   historically and up to that point if I recall.  And
 6   then let them ask questions.  Went around the room,
 7   introduced each employee and their role, and then
 8   asked them if they wanted to see any part of the
 9   office or systems or data store or et cetera, which
10   they did; and they went upstairs into our ops room,
11   and did searches.  I don't know specifically what
12   they did, but I seem to recall them sitting at a
13   station and doing searches and looking at some of
14   our systems.  So that they could understand how it
15   worked, what our processes were, and you know, in an
16   attempt to fully cooperate and help them get to the
17   truth.
18      Q.   Did you -- any of the documents we've
19   marked today, did you discuss any of them with J.D.
20   Barnea?
21      A.   I don't remember any specific TSA
22   information specifically, but I -- I could be
23   mistaken.
24      Q.   Meaning, you don't recall that any of it
25   was discussed; is that what you mean?
```

Page 65

```
 1      A.   Yeah.  I don't recall TSA-specific
 2   information being discussed.
 3      Q.   Do you remember Mr. Barnea asking any
 4   questions?
 5      A.   Again, there were probably 10 people
 6   there.  I don't know, I'm guessing.  Five to ten FBI
 7   and DOJ.  I can't remember who asked questions and
 8   who did not.
 9      Q.   Who at Tiversa was primarily responsible
10   for giving documents and access to these
11   individuals?
12      A.   It was a team effort, but there really
13   wasn't -- they didn't ask for any documents.  We
14   were generally providing them just an overview of
15   our business.
16          If I recall, they didn't ask for any
17   specific documents associated with that visit.
18      Q.   Do you recall Mr. Barnea asking any
19   questions about representations that were made by
20   Tiversa to the TSA before the contract was entered
21   into?
22      A.   I don't remember him asking those
23   questions, no.
24          To be fair, I don't remember J.D.
25   Barnea asking any questions that day; but again, I'm
```

17 (Pages 62 to 65)

Page 66

```
 1   not sure I remember who was who and who asked which
 2   questions.
 3       Q.   Have you ever heard of Sam Rosenberg?
 4            MR. LOVATO:  Objection.  That has
 5   nothing to do with the TSA issues.
 6            MR. VERDREAM:  Join.
 7            MR. HAWKINS:  I don't know that
 8   that's true.
 9            MR. LOVATO:  I'm going to instruct
10   you not to answer any questions regarding CSI or
11   Inpax or Sam Rosenberg.
12       Q.   Are you going to follow your lawyer's
13   instruction?
14       A.   Yes.
15       Q.   But you can answer the question if he
16   were to let you; right?
17            MR. VERDREAM:  Object to the form.
18            MR. LOVATO:  Object.  Same
19   objection.
20       Q.   It's just a yes/no.  I just wanted --
21       A.   I didn't -- what's your question?
22       Q.   If he had let you answer the question,
23   you could answer it; correct?
24            MR. VERDREAM:  Same objection.
25            MR. LOVATO:  Same.
```

Page 67

```
 1            MR. HAWKINS:  Is it -- are you
 2   instructing him not to answer?
 3            MR. LOVATO:  I'm instructing him not
 4   to answer that question, either.  It's beyond the
 5   scope of this deposition and the order of court.
 6       Q.   I may not have asked this real clearly,
 7   but what are your job duties today for Tiversa?
 8       A.   For example, tomorrow I'm going -- or
 9   maybe even this afternoon I'm going to write some
10   checks.  I may be the only person authorized to
11   write checks.  We still pay legal fees, many of
12   them.  Insurance.  You know, we have a few IT costs
13   to keep my e-mail going and things like that.
14            Also, to -- we still have to file
15   taxes.  So I have to keep track of some financial
16   issues with our accountant.
17            We have, you know, board meetings.
18   I'm also on the board; and primarily lately, those
19   are because we don't really have any operations,
20   they're related to, you know, litigation issues
21   primarily.
22       Q.   Who do you report to?
23       A.   The board.
24       Q.   But who on the board in particular, if
25   there is an individual?
```

Page 68

```
 1       A.   There really is no -- there is no
 2   chairman of the board.  There are just three board
 3   members, and so I don't -- I would say I report to
 4   the board generally, and to the shareholders.
 5       Q.   Are you on the board?
 6       A.   I am on the board.
 7       Q.   Are you one of the three?
 8       A.   I am one of the three.
 9       Q.   So the other two are Mr. Adams and
10   Mr. Becker?
11       A.   Yes.
12       Q.   Is insurance paying for the attorneys in
13   this case; is there any insurance paying defense
14   costs?
15       A.   Um -- we have numerous -- as you know,
16   we have numerous cases going on.  Some are -- some
17   attorneys' fees are being covered, some are not,
18   depending on the different case.  I can't recall
19   with regard to this specific case.
20       Q.   Do you know whether there's any
21   insurance coverage for the claims in this case?
22       A.   I'm -- I'm going to speculate here,
23   which I probably shouldn't do.  I don't think there
24   is much of any coverage.  I think this is coming out
25   of our pocket, but I could be mistaken.
```

Page 69

```
 1            Again, there's so many -- it's --
 2   it's pretty hard to keep track of which are being
 3   covered and which are not.  I think that this is
 4   quite expensive for us.
 5       Q.   Yeah.  What's your understanding as to
 6   why Mr. Boback left the company?
 7            MR. LOVATO:  I'm going to object to
 8   that line of questioning.  It's beyond the scope of
 9   the Notice of Deposition, and the order of court.
10            MR. VERDREAM:  Join.
11       A.   I would say it was a decision by the
12   board that I was not a part of and wasn't relevant
13   to my running the company going forward.
14       Q.   Okay.
15            MR. HAWKINS:  Let's take a break.
16            THE VIDEOGRAPHER:  Going off the
17   record.  The time is 10:06 a.m.
18   (RECESS, 10:06 a.m. - 10:13 a.m.)
19            THE VIDEOGRAPHER:  We are back on
20   the record.  The time is 10:13 a.m.
21   BY MR. HAWKINS:
22       Q.   Mr. Schultz, when was the last time you
23   spoke with Mr. Boback?
24       A.   At the New York mediation.  I just said
25   hello to him, and shook his hand.  And I think
```

18 (Pages 66 to 69)

Page 70

1   that's the only interaction we've had.
2        Q.    Since when?
3        A.    Since I left Tiversa in 2009.
4        Q.    Okay.
5        A.    I believe.
6        Q.    Yeah.  And you have a Tiversa e-mail
7   today?
8        A.    I do.
9        Q.    Does anybody else?
10       A.    I don't believe so.
11       Q.    Are any of the costs that you write
12  checks for related to IT other than maintaining the
13  e-mail address?
14       A.    I don't believe so.
15       Q.    Do you know that Mr. Boback was involved
16  in the representations to the TSA?
17       A.    Which representations to the TSA?
18       Q.    Before the -- before the contract was
19  entered into.
20            MR. VERDREAM:  I'll object to the
21  form.
22            MR. LOVATO:  Yeah, object.
23            MR. HAWKINS:  Let me restate it so
24  it's clear.
25       Q.    Do you know whether or not Mr. Boback

Page 71

1   was involved with representations to the
2   Transportation Security Administration before
3   Tiversa entered into a contract with the TSA?
4            MR. VERDREAM:  Object to form.
5            MR. LOVATO:  Join.
6        A.    I believe I do, but only because I've
7   read about that in a -- maybe in a quick read of a
8   deposition, but I have no independent knowledge of
9   that.
10       Q.    Was Mr. Tormasi involved in any of the
11  representations to the TSA before the contract?
12       A.    I don't know whether he was or not.
13       Q.    What about Mr. Carulli?
14       A.    I don't know if he was or not.
15       Q.    What about Mr. Tagliaferri?
16       A.    I don't know if he was or not.  The only
17  people that I might have any understanding of is --
18  again, I think I read somewhere in Mr. Boback's
19  testimony or in some legal document I read in the
20  last week or so, that I believe he said it was him
21  and the current CFO at the time, I can't recall his
22  name, and one other person.  I don't -- so I have no
23  independent knowledge of who else was in that
24  meeting.
25       Q.    Or what was said?

Page 72

1        A.    Or what was said.
2        Q.    Or what documents were provided?
3        A.    Correct.
4        Q.    Or what mattered to the TSA, based upon
5   their conversations?
6        A.    In that meeting, correct.
7        Q.    Was there another meeting with the TSA
8   that you have some awareness of?
9        A.    No, I just -- I do have some awareness
10  that they were not interested in IP addresses.
11       Q.    And that awareness is based upon what?
12       A.    Reviewing the contract, and a proposal,
13  and -- and I believe just general conversation with
14  current employees when I was there, in doing
15  discovery, you know, for specific requests.
16       Q.    But they were interested in IP addresses
17  at some point in time; correct?
18            MR. VERDREAM:  Object to form.
19       A.    I don't --
20            MR. LOVATO:  Object to form.
21       A.    I don't know that it's my interpretation
22  that -- I don't -- I don't know.
23       Q.    Okay.
24       A.    Actually, I should say, I think it's my
25  understanding that they were not; but again, I'm not

Page 73

1   the TSA.  I don't -- I don't know.
2        Q.    What were they interested in?
3            MR. VERDREAM:  Object to form.
4            MR. LOVATO:  Object to form.
5        A.    I can't speak for the TSA.  I would
6   suspect that they were trying to figure out what is
7   their risk associated with peer to peer file
8   sharing.  Trying to understand that better.
9            Again, I don't know.  I'm
10  speculating here.
11       Q.    Do you know whether Tiversa provided
12  legitimate services under the contract with the TSA?
13       A.    Yeah.  Yeah, I have no reason to believe
14  that Tiversa did not.
15       Q.    Do you have any reason to believe they
16  did?
17            MR. VERDREAM:  Object to form.
18            MR. LOVATO:  Object to form.
19       A.    I mean, yes.
20       Q.    Do you know one way or the other?
21       A.    I believe -- I didn't do independent
22  research to determine if -- if we -- I have no
23  independent information to suggest that.
24            But I have every reason to believe
25  that we did.

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com

Page 74

```
 1      Q.   All right.  Do you know if the files
 2 that were being found were actually being found when
 3 Tiversa represented them to have been found?
 4           MR. VERDREAM:  Object to form.
 5           MR. LOVATO:  Join.
 6      A.   Can you repeat the question?
 7      Q.   Sure.  Let me back it up and give some
 8 foundation.
 9           Tiversa was making representations
10 to the TSA about finding certain TSA-related files
11 on peer to peer networks as part of its contract.
12 Is that your understanding?
13      A.   I don't know that for sure, but I --
14 that wouldn't surprise me.
15      Q.   Okay.  Do you know whether or not
16 Tiversa actually provided files and information
17 about files to the TSA as part of the contract?
18           MR. VERDREAM:  Object to form.
19           MR. LOVATO:  Join.
20      A.   I believe they did because I think -- I
21 recall seeing tickets that I assume were issued, and
22 I recall, you know, speaking to employees when I was
23 there about the relationship.
24      Q.   Which employees?
25      A.   Mr. Tormasi.
```

Page 75

```
 1      Q.   Okay.  What did he tell you about the
 2 relationship?
 3      A.   He just generally described.  It sounded
 4 very similar to other customers that we served,
 5 except that -- I believe it was he that mentioned
 6 that they were not interested in IP addresses, and
 7 the source of the content that we were finding.
 8      Q.   Was Tiversa searching the entire P2P
 9 networks to find TSA-related files for the TSA as
10 part of its contract obligations?
11      A.   I'm not sure I understand your question.
12      Q.   Did Tiversa search the entire P2P
13 networks for TSA-related files as part of its
14 obligations to the TSA?
15           MR. LOVATO:  Object to form.
16           MR. VERDREAM:  Join.
17      A.   I was not at the company at the time,
18 but I have no reason to believe that Tiversa did not
19 use all of its systems and abilities to search for
20 TSA-related information wherever -- and again, the
21 business evolved, so there were times that during
22 the business, could have been this time, when we
23 were searching locations even outside the peer to
24 peer.
25           So I believe that -- I have no
```

Page 76

```
 1 reason to believe that the company was not using all
 2 of its systems and resources to work on behalf of
 3 the TSA.
 4      Q.   And what were the capabilities of
 5 Tiversa as far as number of searches per day during
 6 the time that services were being provided to the
 7 TSA?
 8      A.   I don't know that information --
 9      Q.   Do you have any idea?
10      A.   I don't.
11      Q.   Hundreds, millions, thousands, billions,
12 any idea?
13           MR. VERDREAM:  Object to form.
14           MR. LOVATO:  Object to form.
15      A.   I don't -- I don't know.  A lot.
16      Q.   How would you find out?
17      A.   Go back and look at some of the
18 literature, you know, at the time.
19      Q.   You would trust the literature?
20      A.   Yes.
21      Q.   All of it?
22           MR. VERDREAM:  Object to form.
23           MR. LOVATO:  Join.
24      A.   Yes.
25      Q.   You would trust the literature over
```

Page 77

```
 1 asking somebody like Anju Chopra?
 2      A.   Well, I believe that Anju Chopra, you
 3 know, provided the information that would end up in
 4 the literature.
 5      Q.   Do you know that for a fact?
 6      A.   I don't know that for a fact, no.  But I
 7 would assume that to be the case.
 8      Q.   That's okay.  We're not --
 9      A.   I'm confident that that is the case.
10      Q.   All right.  Do you know what EP2P is?
11           MR. VERDREAM:  Object to form.
12      A.   I had never heard of EP2P until I have
13 seen them in legal documents, and I think it might
14 have been associated with Rick Wallace's deposition
15 in this case or another case.  I'm not sure.  I had
16 never heard of it before.
17      Q.   Do you know whether EP2P was used in
18 connection with providing services to the TSA?
19      A.   I don't know if it was used.
20           And again, I don't think I had heard
21 of it at that time.  I can't recall if I heard of it
22 in my time away.  I don't know, was it -- Michael,
23 was it in your book?
24           MR. LOVATO:  Don't ask questions to
25 the --
```

1      A.   I don't know.
2           MR. HAWKINS:  You can ask him
3   offline, but not during the deposition.
4           THE WITNESS:  Okay.
5   BY MR. HAWKINS:
6      Q.   What systems did Tiversa use to carry
7   out its services for the TSA?
8      A.   I mean, there are -- there are a lot of
9   systems, primarily Eagle Vision was monitoring the
10  peer to peer.  We might be --
11     Q.   Hold on.  I'm sorry.  Just to be sure.
12  I'm asking about for the TSA, not generally.  And if
13  you don't know, that's okay.  But if you -- my
14  question really is, what systems were being used by
15  Tiversa for carrying out its responsibilities under
16  the TSA contract?
17     A.   I can't say specifically what systems
18  were used.
19     Q.   Do you know whether there were any
20  stand-alone searches being conducted for the TSA?
21     A.   I don't know.
22          MR. HAWKINS:  All right.  That's all
23  I have for now.
24          THE WITNESS:  Okay.
25          MR. VERDREAM:  I have no questions.

1   Thank you for coming.
2           MR. LOVATO:  No questions.
3           THE WITNESS:  Okay.
4           THE VIDEOGRAPHER:  This concludes
5   the videotaped deposition of Griffin Schultz.  The
6   time is 10:23 a.m.
7   (Signature not discussed.)
8   (CONCLUDED, 10:23 a.m.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1           ACKNOWLEDGMENT OF DEPONENT
2
3       I, GRIFFIN SCHULTZ, do hereby acknowledge
4   that I have read and examined the foregoing
5   testimony, and the same is a true, correct and
6   complete transcription of the testimony given by me
7   and any corrections appear on the attached Errata
8   sheet signed by me
9
10
11   _____    _____
12      (DATE)              (SIGNATURE)
13
14
15
16
17
18
19
20
21
22
23
24
25

1           CERTIFICATE OF COURT REPORTER
2
3       I, Marjorie Peters, Registered Merit
4   Reporter, Certified Realtime Reporter, and Notary
5   Public in the State of Pennsylvania, before whom the
6   foregoing deposition was taken, do hereby certify
7   that the witness was placed under oath according to
8   the law; that the foregoing transcript is a true and
9   correct record of the testimony given; that said
10  testimony was taken by me stenographically and
11  thereafter reduced to typewriting under my direction
12  and that I am neither counsel for, related to, nor
13  employed by any of the parties to this case and have
14  no interest, financial or otherwise, in its outcome.
15      I further certify that signature was
16  not waived by the witness.
17      IN WITNESS WHEREOF, I have hereunto set my
18  hand this    day of       , 2019.
19
20
21
22   _____
23  Marjorie Peters, RMR, CRR
24  My commission expires March 13, 2020.
25

```
1          ERRATA SHEET
2      IN RE: USA v. Tiversa Holding Corp
3      DEPONENT: Griffin Shultz
4      DATE: July 18, 2019      REF: 25628
5      = = = = = = = = = = = = = = = = = = = = = = = = =
6      PAGE/LINE        CORRECTION AND REASON
7      _____
8      _____
9      _____
10     _____
11     _____
12     _____
13     _____
14     _____
15     _____
16     _____
17     _____
18     _____
19     _____
20     _____
21
22     _____   _____
23      DATE            Griffin Shultz
24
25     NOTARY PUBLIC:
```

**A**

abilities 75:19
ability 29:14 30:9
57:16
access 27:15 28:24
29:16 57:16 58:3
60:1 62:13 65:10
account 58:3
accountant 67:16
accounts 19:14,17
accuracy 23:11
24:3
accurate 12:9
acknowledge 80:3
ACKNOWLED...
80:1
acquirer 13:22
14:2,22 15:12,13
15:16
acquisition 14:23
Action 1:6
actual 29:17
Adams 68:9
addition 63:17
address 10:6 34:10
42:16 70:13
addresses 60:10
72:10,16 75:6
Administration
33:8 39:6,23
40:15 43:25 55:18
55:23 71:2
affidavit 4:8 16:13
16:20 61:4,11
afternoon 67:9
agencies 32:1 43:3
61:19
agents 23:15 24:7
ago 41:17 55:2
56:13
agreement 15:18
ahead 9:24 23:10
58:8 59:7 62:3
Air 5:12 39:16,22
al 7:5,5
allowed 62:13

altered 52:1,9 54:2
54:6,9,18
altering 54:14
America 1:4 7:5
Andrew 3:22 7:13
Andy 16:6 56:4
57:5,14
Anju 16:4 28:22
50:21 57:8,14
77:1,2
annual 44:13
answer 9:25 10:1
14:14 17:12,25
20:16 24:18 25:23
27:21 30:21,23
39:13,13 53:9
59:21 62:2 66:10
66:15,22,23 67:2
67:4
answering 23:22
24:13
anybody 20:19
37:7 43:4 54:2,6
70:9
anymore 57:22
appear 80:7
application 30:15
61:5
approached 12:21
approximate 57:10
approximately
7:12
areas 44:25
armor 18:8
arrived 31:14
aside 54:13
asked 9:17 37:10
43:4 64:8 65:7
66:1 67:6
asking 9:6 21:14
30:4 31:19 41:1
50:10 65:3,18,22
65:25 77:1 78:12
assessment 4:22
36:3,11
asset 13:21 18:5,7
19:13 58:2

assets 14:1,23
15:21,22 17:5,15
17:18,20,21 18:2
18:7,20 19:19
46:22 56:21 59:18
60:1
assisted 25:20
26:12 37:19
associated 12:12
65:17 73:7 77:14
association 7:15
assume 31:7 32:16
74:21 77:7
assumptions 31:8
as-needed 15:6
attached 61:4 80:7
attachment 37:5
attempt 64:16
attorney 3:3 7:20
9:25 18:6 58:11
58:12 62:24
attorneys 19:24
20:20 23:24,25
24:12 58:17 60:8
62:25 68:12,17
August 5:15 40:5
authorized 67:10
available 10:19,20
29:16 34:7
avoid 9:12
aware 43:16
awareness 44:16,18
44:19 72:8,9,11
a.m 1:16 2:9 7:12
21:4,5,5,7 24:24
24:25,25 25:2
37:24,25,25 38:2
55:11,12,12,14
69:17,18,18,20
79:6,8

**B**

B 4:6 5:1 6:1
back 12:21 19:10
19:12 21:6 22:19
25:1 31:12 34:5
38:1 45:15 52:9

55:1,3,13 56:17
60:17 61:1 63:22
69:19 74:7 76:17
background 6:12
6:16,19 12:20
14:10,14,18 18:24
19:6 28:23 47:23
48:4 49:19 50:25
51:6
backup 19:15
bank 19:14,17
Barnea 62:22 64:20
65:3,18,25
based 15:7 24:15
37:20 44:21 59:17
62:5 72:4,11
basis 15:6
Bates 5:20 27:12
28:10 42:9 43:21
48:18
Becker 68:10
behalf 7:22,25 76:2
believe 15:17 25:10
34:11 40:11 53:15
53:20 56:2,22
57:1 62:23 70:5
70:10,14 71:6,20
72:13 73:13,15,21
73:24 74:20 75:5
75:18,25 76:1
77:2
best 48:6
better 31:19 73:8
beyond 57:15 61:21
67:4 69:8
billion 50:5,11,13
50:16
billions 76:11
bit 51:4
Blair 3:4
board 67:17,18,23
67:24 68:2,2,4,5,6
69:12
Bob 11:16
Boback 1:9 3:13
7:25 11:16 69:6
69:23 70:15,25

Boback's 71:18
book 77:23
bother 28:2
bottom 27:12
Brandon 3:14 7:24
breach 5:3 38:3
43:24
break 5:7 9:22
24:22 38:25 48:22
69:15
brief 20:15
broad 58:25
build 11:10
building 18:9,15
built 54:20
bullet 42:14
burnt 60:10
business 12:22,25
13:2,11,14 15:25
16:5 18:8 31:14
64:1,4 65:15
75:21,22
bverdream@clar...
3:16
Byrne 23:13 24:5

**C**

C 3:1 7:1
call 27:23 48:17
called 2:2 33:21,23
capabilities 32:5
76:4
capability 50:18
capacity 8:18 13:24
15:1
carry 78:6
carrying 56:1
78:15
Carulli 56:4,7,11
57:6 71:13
case 20:7 22:11
25:15 43:7,13
68:13,18,19,21
77:7,9,15,15
81:13
cases 60:15 68:16
Centre 3:15

**CEO** 12:19,21
13:23 15:1,4 18:3
31:22 56:6
**certain** 25:5 35:25
44:25 61:12 74:10
**CERTIFICATE**
81:1
**Certified** 2:5 81:4
**certify** 81:6,15
**cetera** 64:9
**CFO** 15:24 56:23
71:21
**CFO's** 16:8
**chairman** 68:2
**challenging** 12:22
12:25 13:14
**changed** 31:13,18
54:10
**check** 42:25
**checked** 42:24
**checks** 67:10,11
70:12
**Chilcote** 2:7 3:9
7:10
**Chopra** 16:4 28:22
50:21 57:8 77:1,2
**chosen** 8:10
**Chris** 7:22
**Christopher** 3:8
**CIO** 15:24 16:4
**Civil** 1:6 25:5
**claimed** 52:3
**claims** 68:21
**CLARK** 3:14
**clear** 8:23 9:5 19:3
25:16 70:24
**clearly** 24:16 26:10
67:6
**close** 23:18 24:8
29:20 30:18,19
32:6 42:16
**closed** 18:10
**clovato@dmclaw...**
3:11
**collect** 56:8
**collecting** 31:16
46:22

**collection** 40:22
**collectively** 17:3
**column** 53:22
**come** 12:17 16:11
34:9 63:24
**comfortable** 41:18
41:20
**coming** 12:21 32:15
68:24 79:1
**Command** 5:12
39:16,22
**comment** 31:2
**commission** 81:24
**Commonwealth**
2:6
**communicate**
34:15
**communicated**
23:12
**communicating**
11:21
**communication**
59:14
**communications**
38:21 60:3
**companies** 17:6,14
**company** 6:11 12:3
13:7 15:24,25
29:2 30:1 31:1,20
32:8,10 34:8
43:11 47:23 48:4
59:18 62:11 63:21
69:6,13 75:17
76:1
**compensation** 15:7
15:16
**complete** 80:6
**completed** 18:13
**comprehensive**
45:6,25
**computers** 19:15
**CONCLUDED**
79:8
**concludes** 79:4
**conclusion** 17:9
27:21
**conclusions** 27:23

**conducted** 25:7
50:5,10,16,17
78:20
**confident** 77:9
**confidentiality**
14:4
**confirmed** 32:4
**confusion** 9:15
**connect** 30:15,17
**connection** 43:17
77:18
**consider** 19:13
27:24
**consistent** 25:14
**constant** 15:8,10
**consultants** 57:10
**consumer** 31:15
**contained** 23:16
24:4 44:17
**content** 34:13 75:7
**continue** 13:6
**continued** 13:7
**contract** 14:4 18:11
20:7 33:16,21,23
43:18 55:19,23
56:1 58:2,22 59:5
63:4 65:20 70:18
71:3,11 72:12
73:12 74:11,17
75:10 78:16
**conversation** 72:13
**conversations** 60:8
63:3 72:5
**convey** 46:10 49:15
**convince** 13:15
**cooperate** 64:16
**cooperated** 62:4,10
**cooperating** 63:16
**copies** 19:15
**copy** 57:21,24
**Corp** 1:8 3:7 7:5
82:2
**corporate** 18:8
58:11,12 59:12
**Corporation** 10:12
17:2
**correct** 8:13 10:23

10:24 16:24 17:6
25:11 26:24 29:20
29:22 32:11 38:23
41:14 66:23 72:3
72:6,17 80:5 81:9
**CORRECTION**
82:6
**corrections** 80:7
**correspondence**
8:16
**costs** 67:12 68:14
70:11
**Cote** 1:7
**counsel** 7:17 81:12
**couple** 14:3 20:6
**court** 1:1 7:6,14
8:16 9:10 19:12
26:1,10 55:3
59:17 67:5 69:9
81:1
**cover** 33:6
**coverage** 68:21,24
**covered** 68:17 69:3
**crawling** 29:11
**crawls** 29:8,10
**create** 52:14 53:24
**created** 13:14 29:1
44:14 46:8 52:22
52:25
**Crilley** 57:8
**Critical** 46:22
**Crowders** 23:13
24:5
**CRR** 81:23
**CSI** 66:10
**Cumming** 3:4
**current** 32:2 71:21
72:14
**cursory** 36:1
**customer** 5:17 11:9
11:10 40:18
**customers** 11:22
13:3,3,7,8,16,16
32:2 56:8 75:4
**Cyberintel** 46:22
**Cyberintelligence**
6:7 46:15,21

**D**

**D** 4:1,6 5:1 6:1 7:1
**data** 6:3 19:15
45:20,25,25 54:9
54:17 57:17,17,20
57:23 58:4 64:9
**database** 53:20
**date** 33:8 36:13
52:14,22,25,25
53:13,24,25 80:12
82:4,23
**dated** 22:10
**dates** 34:5 54:3,7,9
54:14,17
**Daugherty** 1:5 3:20
7:21 49:6
**day** 50:5,11,16 63:5
65:25 76:5 81:18
**dealt** 53:19
**December** 11:3
23:16 24:8
**decision** 69:11
**defendant** 1:10 3:7
3:13 7:25
**defense** 68:13
**definitions** 21:22
**definitive** 59:5
**deliver** 50:3
**delivery** 11:10
**Denise** 1:7
**Department** 35:21
36:12,20,23 62:5
**departure** 56:14
**depending** 68:18
**DEPONENT** 80:1
82:3
**deposition** 1:14 2:1
7:3,9 8:9,14 19:23
20:10,13,21 21:22
22:7 26:23 60:14
61:22 67:5 69:9
71:8 77:14 78:3
79:5 81:6
**describe** 21:25 63:6
63:11
**described** 75:3

describing 36:19
designee 8:9,11,13
  8:18 25:6,8
detail 48:22
detailed 30:4
detect 29:15
detection 4:19
  34:23 35:4
determine 29:17
  42:25 73:22
determining 54:16
dev 57:9
development 16:1
  16:5
Dickey 7:10
Dickie 2:7 3:9
different 30:22
  50:2 51:5 68:18
difficult 13:11
diligence 31:25
diligent 25:7
direct 12:11
directed 37:20
direction 81:11
disclosed 34:11
disclosing 34:10
disclosure 29:17,20
  42:16
discovery 19:2
  26:13 37:9 43:3
  59:24 60:2 62:20
  63:18,19 72:15
discuss 64:19
discussed 64:25
  65:2 79:7
Discussion 5:14
  40:5
distinguish 9:14
distributed 49:7
  56:3
District 1:1,2 7:6,7
  62:7,25
Docket 7:7
document 25:20
  26:22 27:4,8,9
  33:10,12 35:3,12
  35:14,16,18 36:10

36:16,22 38:10,13
38:16,23 39:4,7,9
39:20,24 40:2,12
40:13 41:12,22
42:1,5 43:23 44:1
44:5,8,10 45:5,12
45:17,24,24 46:3
46:11,17,20 47:7
47:8,11 48:2,3,3,5
48:6,8,24 49:12
49:16,23,24 50:1
50:8,9,15 51:4,5
51:12,17,19,22
52:11,22,23 53:6
53:14 61:7 71:19
documents 20:8,13
  22:3 23:2,17 27:9
  29:18 38:11 59:23
  60:3 64:18 65:10
  65:13,17 72:2
  77:13
doing 11:20 34:20
  64:13 72:14
DOJ 62:15 63:22
  64:3 65:7
download 29:16
  52:25
downloaded 52:23
  53:5,10,14
Due 31:25
duly 8:4
duties 67:7
duty 24:16 25:25
  26:11
D.C 62:7

**E**

E 3:1,1 4:1,6,6 5:1
  5:1 6:1,1 7:1,1
Eagle 78:9
earlier 23:23 56:16
early 13:9 56:18
effect 54:12
effort 65:12
either 9:2,4 17:18
  18:13 43:16 46:5
  67:4

electronic 19:18
employed 10:9
  81:13
employee 8:17
  13:21 25:16,19
  26:12 64:7
employees 11:25
  23:14 24:7 25:17
  25:18,25 26:7
  55:18,21 56:20
  59:4 64:2 72:14
  74:22,24
employment 15:18
enforcement 32:1
entered 55:19,23
  58:23 59:5 65:20
  70:19 71:3
enterprise 32:2
entire 27:15 28:24
  29:19 75:8,12
entities 7:23 17:21
  18:20 25:11
environment 13:15
EP2P 77:10,12,17
Eric 58:16,18
Errata 80:7 82:1
Esq 3:3,8,14
et 7:5,5 64:9
everybody 8:24
evolved 41:17
  75:21
ex 1:4
exactly 15:17 16:6
  18:5 62:16
examination 2:3
  4:2 8:6 21:23
  22:19,23 23:9
examined 8:5 80:4
example 13:1 53:5
  67:8
excuse 17:19 63:13
executive 6:14
  48:12,24
exhibit 4:7,8,9,10
  4:12,15,18,21 5:2
  5:3,6,10,14,17,19
  5:21 6:2,3,6,9,11

6:14,16,19,22
16:13,15 21:8
26:16 27:1 32:18
33:1 34:22 36:2
38:3,25 39:15
40:5,17,18 43:20
45:2,15,20,23
46:14 47:3,23
48:12 49:19 50:25
51:15 60:23 61:2
61:3,3
existing 13:16
expensive 69:4
expert 29:8,9 37:15
  52:21
expertise 55:5
expires 81:24
extensive 32:3
extent 17:11 20:17
  24:15 26:15 50:8
e-mail 37:4,16
  38:21 59:14 67:13
  70:6,13

**F**

F 4:6 5:1 6:1
facing 12:23
fact 77:5,6
fair 65:24
false 27:19 28:20
  30:20
familiar 45:9 46:6
  46:9 47:15,17,19
  48:5 49:14
far 56:13 76:5
FBI 61:17 62:15
  63:20,23 64:3
  65:6
federal 5:3,6 25:5
  38:3,25 43:24
feed 6:3 45:20,25
  46:1
fees 67:11 68:17
fellow 62:21
field 53:21
figure 17:14 43:15
  73:6

file 6:22 29:19
  51:15,18 52:17
  53:4 60:5 67:14
  73:7
files 29:16,18 52:2
  52:3 53:1,3 54:9
  74:1,10,16,17
  75:9,13
fill 44:24
financial 67:15
  81:14
find 36:25 37:2,16
  38:19 39:12 43:12
  59:9,10 75:9
  76:16
finding 74:10 75:7
fine 9:17,23 14:9
fired 11:16
firm 32:5
first 8:4 10:25
  13:10 21:16,25
  28:3,10 30:13
  34:18 41:4 42:14
five 55:8 64:3 65:6
five-minute 24:22
Floor 3:15
flow 22:7
focus 31:14
focussed 31:15
folks 31:20 53:19
  56:4
follow 66:12
follows 8:5
foregoing 80:4 81:6
  81:8
forensic 5:10 39:15
  39:21
form 17:23 27:24
  29:21 33:17,18
  40:25 41:1,4,5,7
  41:19 44:6,11,15
  44:22 45:8,9 46:5
  46:6 47:15 49:13
  50:1,6,7,22 52:4,5
  53:7 54:4,22
  57:18,19 58:8
  59:6 61:24 63:14

66:17 70:21 71:4
72:18,20 73:3,4
73:17,18 74:4,18
75:15 76:13,14,22
77:11
**formal** 12:4
**format** 41:8
**former** 25:18,25
26:7
**forms** 46:7
**forth** 31:12
**forward** 69:13
**found** 52:3 74:2,2,3
**foundation** 74:8
**four** 13:10
**friend** 16:9 56:23
**front** 36:10 39:4,20
43:23 46:20 60:20
**full** 10:5 13:17,19
22:9 57:10
**Fuller** 23:13 24:5
**fully** 62:4,10 63:16
64:16
**full-time** 13:21
**further** 81:15

**G**

**G** 7:1
**GA** 3:4
**gap** 47:21
**gather** 25:18
**general** 35:10
36:13 44:18,19,20
44:21 63:25 72:13
**generally** 23:23
28:24 41:15,18,21
43:8,11 44:13,14
46:9 49:14 50:2
52:20 56:2 65:14
68:4 75:3 78:12
**give** 11:19 13:1
35:1 56:24 74:7
**given** 39:10 40:3,14
41:6 42:5 45:13
45:18 46:12 47:12
49:17 59:25 80:6
81:9

**giving** 65:10
**glad** 9:4
**glasses** 22:4
**Glenn** 57:7
**go** 8:22 9:24 21:1
22:19 23:10 25:17
25:25 35:6 37:21
45:15 54:16 56:20
58:8 59:6 60:17
60:18,23 62:3
76:17
**goes** 26:8
**going** 16:15 18:22
21:3 24:14,23
27:4 37:23 45:23
47:6 48:14 55:10
59:16 64:3 66:9
66:12 67:8,9,13
68:16,22 69:7,13
69:16
**good** 8:8 11:21 16:9
41:2 56:22
**Google** 29:7,7,9
**gosh** 56:12
**government** 1:9 3:7
17:3 31:25 43:3
61:20
**grab** 22:4
**Grant** 3:15
**great** 10:3
**Greg** 23:14 24:6
**Griffin** 1:14 2:1 4:3
7:3 8:3 10:7 79:5
80:3 82:3,23
**ground** 8:22 9:9
**Grove** 10:7
**guess** 13:25 14:4
15:20 20:15 29:24
37:3 41:21 56:18
59:12,22 63:20
64:3
**guessing** 65:6

**H**

**H** 4:6 5:1 6:1
**Halliwell** 3:22 7:13
**Hamilton** 58:15

**hand** 69:25 81:18
**handed** 48:23 49:2
49:5
**handing** 21:11
26:18 38:7 46:17
**happens** 9:19
**hard** 9:13 69:2
**Harris** 12:18
**Hawkins** 3:3,3 4:4
7:19,20 8:7,12,19
8:21 14:12,16
19:5,10 21:1,10
22:12,15,17 25:3
26:3,6 27:22 28:4
28:7,12,16,18
38:6 41:2 44:7
49:3,10 54:25
55:9,15 60:4
61:23 66:7 67:1
69:15,21 70:23
78:2,5,22
**head** 9:10,16 31:12
**headed** 42:13
**hear** 9:2,3
**heard** 60:5,11,12
60:16 66:3 77:12
77:16,20,21
**held** 7:9
**hello** 69:25
**help** 12:22 64:16
**helping** 11:10
12:10,25
**hereunto** 81:17
**hesitate** 9:20
**HILL** 3:14
**historically** 64:5
**Hold** 78:11
**holding** 1:8 3:7 7:5
17:2 60:20 82:2
**Homeland** 35:21
36:12,20,23
**Hopkins** 28:22
50:20
**hosting** 42:15
**HSTS03-11-Q-C...**
38:14
**HSTS03-11-R-C...**

35:15
**huge** 58:1
**huh-uh** 9:13
**Hundreds** 76:11

**I**

**idea** 76:9,12
**identification**
16:14 21:9 26:17
27:3 33:3 34:24
36:4 38:5 39:2,18
40:7,20 43:21
45:4,22 46:16
47:5,25 48:13
49:21 51:2,16
**implies** 24:15
**implying** 26:10
**important** 10:18
**impose** 25:24
**imposes** 25:5
**including** 23:16
**independent** 60:9
60:15 71:8,23
73:21,23
**individual** 30:14
67:25
**individually** 62:13
**individuals** 23:18
62:21 65:11
**industry** 32:2
**information** 14:14
18:25 23:12,16
24:3 25:8,18
31:16 34:10,13
37:16 43:5,12
44:17,20,20,21
46:7 53:15 54:11
56:8 58:4 63:6,12
64:22 65:2 73:23
74:16 75:20 76:8
77:3
**Inpax** 66:11
**Inspector** 36:13
**instruct** 66:9
**instructed** 10:1
**instructing** 67:2,3
**instruction** 66:13

**insurance** 67:12
68:12,13,21
**intelligence** 45:7
46:1 51:7
**intending** 14:17
**interacted** 41:12
**interaction** 62:19
70:1
**interest** 81:14
**interested** 72:10,16
73:2 75:6
**interim** 12:19
**interpretation** 25:9
25:14 35:20 72:21
**interrogatories**
25:21
**interrupt** 22:6
**introduce** 7:17
**introduced** 64:7
**investigating** 62:6
**investigation** 5:11
26:9 39:16,21
**investigations**
63:17
**invited** 62:9,10
63:22,24
**inviting** 35:22
**involved** 70:15 71:1
71:10
**IP** 34:10 42:16
60:10 72:10,16
75:6
**ISP** 34:12,14 42:15
**issue** 30:2,3
**issued** 29:15 42:15
74:21
**issues** 9:21 13:14
14:11 18:24 19:2
19:4 22:11 24:18
66:5 67:16,20
**items** 19:14

**J**

**J** 1:5 3:14,20 7:21
**James** 3:3,3
**January** 11:14,24
23:15 24:7

**January/February**
56:19
jhawkins@james...
3:5
**Jim** 7:19 28:2
32:21
**job** 1:25 10:13,15
10:16 11:21 13:17
67:7
**join** 19:7 50:24
53:8 54:5,23 58:9
61:25 63:15 66:6
69:10 71:5 74:5
74:19 75:16 76:23
**joint** 62:12
**Jones** 12:18
**Judge** 1:7
**July** 1:16 2:9 5:4,7
7:11 16:24 38:4
39:1,6 82:4
**June** 4:23 5:19 17:4
22:10 36:3,14
43:20,23 56:17
**Justice** 62:5
**J.D** 62:22 64:19
65:24

**K**
**keep** 22:14 67:13
67:15 69:2
**Keith** 12:1
**kept** 57:21,23
**Kickoff** 5:14 40:5
**Kirtley** 3:21
**Kline** 58:16
**knew** 12:20
**know** 9:20 11:7
12:19 13:15 17:12
17:15,16 18:4
21:15,17,20 22:2
22:3,24 23:3
27:21 28:25 29:10
29:24 30:1,5 31:6
31:9,11,20 32:13
32:13,18,20 33:12
33:14,15,19,21,23
34:2,3,20 35:19

35:22 36:17,22,24
37:19 38:16,18
39:9,11 40:2,4,13
40:16,24 42:4,10
42:19,22 44:24
45:10,10,12,14,17
45:19 46:2,8,11
46:13,25 47:2,11
47:13,21 48:8,10
49:16,18 50:4,11
50:15,17 51:12,14
51:22,24,25 52:8
52:12,14 53:13,21
54:1,2,6,8,10,11
54:20 55:6,16,21
55:25 57:13,14,25
58:1,5,10,11,20
59:2 60:2,7 61:14
61:15 62:18,19
64:11,15 65:6
66:7 67:12,17,20
68:15,20 70:15,25
71:12,14,16 72:15
72:21,22 73:1,9
73:11,20 74:1,13
74:15,22 76:8,15
76:18 77:3,5,6,10
77:17,19,22 78:1
78:13,19,21
**knowledge** 18:25
24:17 29:22 32:14
37:7,11,12 50:19
59:17 71:8,23
**knowledgeable**
26:14
**known** 14:6
**Kristen** 23:12 24:5
**Kroll** 14:2,7 17:22
18:7,15 56:14,21
57:12

**L**
**L** 1:7
**label** 42:9 48:18
**lack** 23:11 24:3
**large** 37:16
**lately** 67:18

**law** 3:3 32:1 81:8
**lawyer** 17:7,17
48:21
**lawyers** 43:4 62:20
**lawyer's** 66:12
**leaders** 32:3
**leading** 12:11
**lease** 18:17
**leave** 11:15
**left** 11:13,24 31:5,5
32:7,9,12 69:6
70:3
**legal** 7:14,16 13:13
13:14 17:8 22:3
27:20,23 29:25
30:2,5 67:11
71:19 77:13
**legitimate** 73:12
**let's** 10:5 21:1 23:8
24:21 41:4 69:15
**Levato** 8:12 25:3
**level** 32:2
**Leveraging** 6:6
46:14,20
**lightly** 62:3
**limiting** 14:11 19:4
22:10
**line** 14:9 69:8
**LinkedIn** 19:25
20:5
**listing** 22:22
**literature** 76:18,19
76:25 77:4
**litigation** 40:23
67:20
**little** 12:24
**locations** 75:23
**log** 53:20
**logged** 53:15,17
**long** 11:11 14:13
41:16
**longer** 56:13
**look** 16:17 21:12
26:19 27:5 33:5
36:7 38:8,20 40:9
41:10 46:18 47:17
47:19 59:12 76:17

**looked** 11:3 19:24
20:6 22:18 23:2
37:6,7,12 43:6,9
43:10
**looking** 21:24
31:16 35:22 43:16
64:13
**looks** 21:21 35:20
36:18,18 44:14
45:9 46:7 47:15
47:20 48:3 49:13
50:1 51:3
**lot** 11:8 22:2 62:19
76:15 78:8
**Lovato** 3:8 7:22,22
8:15 14:8,13 17:8
17:11,23 18:22
19:8 20:16 22:6
22:13 24:14 25:13
26:4,8 27:20 28:1
28:5 29:3,23
33:18 35:1 37:10
37:21 40:25 42:7
44:4 48:18 49:1,4
49:8 50:7,24 52:5
53:7,9 54:5,23
55:8 57:19 58:7
59:6,20,23 61:21
62:1 63:15 66:4,9
66:18,25 67:3
69:7 70:22 71:5
72:20 73:4,18
74:5,19 75:15
76:14,23 77:24
79:2
**love** 9:2
**lower** 48:15

**M**
**Maier** 23:14 24:6
**maintain** 53:3
**maintained** 54:20
**maintaining** 70:12
**making** 74:9
**managing** 11:7,9
**March** 81:24
**Marjorie** 1:24 2:4

7:15 8:1 81:3,23
**mark** 16:16
**marked** 16:13
20:23 21:8,12
26:17,19 27:2,5
33:2,4 34:24 36:4
36:5 38:5 39:2,17
40:6,19 43:21
45:3,5,21 46:15
46:17 47:4,24
48:13 49:20 51:1
51:16 64:19
**marking** 48:15
**matter** 7:4 25:22
**mattered** 72:4
**matters** 62:6
**McCamey** 2:7 3:9
7:10
**mean** 17:14 41:7
47:17 52:20 53:10
64:25 73:19 78:8
**Meaning** 64:24
**means** 8:25 52:12
52:14
**mediation** 69:24
**meeting** 23:25
71:24 72:6,7
**meetings** 67:17
**members** 68:3
**mentioned** 75:5
**Merit** 2:4 81:3
**met** 19:24 23:23
55:18,21 62:11
**metadata** 52:16,17
52:21 53:2,3,4,5
**metafile** 52:15
**Michael** 1:5 3:20
7:21 23:13 24:5
77:22
**Mike** 56:4,7,11
57:6,15
**million** 30:18
**millions** 76:11
**mind** 30:3
**mine** 16:9 32:23
**minute** 16:12
**misrepresents** 50:8

**Mission** 46:22
**mistaken** 16:2
  64:23 68:25
**Mm-hmm** 10:2
  16:25
**modified** 52:1,9
  53:25 54:17
**moment** 16:10 21:2
**monitoring** 4:18
  5:10,21 6:9 34:22
  35:4,23 39:15,20
  45:2,6,7,11 47:3,7
  78:9
**months** 13:10
  15:19,21 56:12,17
**morning** 8:8 11:3

**N**

**N** 3:1 4:1,6 5:1 6:1
  7:1
**name** 7:13,19 10:6
  16:8,10 56:23
  71:22
**named** 62:22
**nature** 19:16
**Naval** 5:12 39:16
  39:22
**need** 9:11,22 15:7
  21:25 25:4 30:23
**negotiated** 18:11
**neither** 81:12
**network** 52:24
  53:14
**networks** 6:17,20
  29:17,19 49:20
  50:13 51:1,6 52:3
  74:11 75:9,13
**never** 60:12 77:12
  77:16
**new** 1:2 7:7 13:15
  20:24 62:8,25
  69:24
**Ngom** 23:14 24:6
**non-technical** 29:9
**Notary** 2:5 81:4
  82:25
**note** 14:10 34:13

36:9
**notes** 4:10 26:16
**notice** 2:3 4:9 8:14
  21:8,21 35:21
  69:9
**number** 7:3,7
  16:16 17:1 23:8
  23:10 24:2 27:12
  35:15 60:25 76:5
**Numbers** 28:10
**numerous** 68:15,16

**O**

**O** 4:6 5:1 6:1 7:1
**oath** 81:7
**object** 14:8 24:14
  29:3,21 33:17,18
  40:25 50:6,7,22
  52:4,5 53:7 54:4
  54:22 57:18,19
  58:7 59:6 61:21
  61:24 63:14 66:17
  66:18 69:7 70:20
  70:22 71:4 72:18
  72:20 73:3,4,17
  73:18 74:4,18
  75:15 76:13,14,22
  77:11
**objected** 19:3 22:8
**objection** 17:8,23
  18:23 22:14 27:20
  27:25 29:23 42:7
  44:4 66:4,19,24
**obligation** 25:11
  34:14
**obligations** 25:6
  75:10,14
**obviously** 14:10
**occurred** 42:25
**offered** 34:20
**office** 36:13 57:4
  62:25 63:21 64:9
**offices** 62:5,10
**officials** 62:15 64:3
**offline** 78:3
**oh** 11:17 16:8 21:1
  23:5 31:1 32:24

42:8 48:17 56:12
  60:19,19
**Ok** 8:19
**okay** 9:7 10:1,3,20
  10:25 12:5,13,24
  14:19 15:12 16:11
  17:18 19:20,22
  21:24 22:16 24:21
  26:3 28:1,9,19
  30:8,13 31:24
  35:8,13,24 41:23
  44:23 47:22 48:20
  48:23 49:8 52:23
  56:15 58:19 59:15
  60:10 63:11 69:14
  70:4 72:23 74:15
  75:1 77:8 78:4,13
  78:24 79:3
**onboard** 13:16
  18:11,12,14 32:15
**once** 29:4,7
**ongoing** 13:14
**operated** 12:3
**operation** 16:5
**operations** 62:14
  67:19
**ops** 57:7 64:10
**order** 14:11 19:3
  22:9 24:15,16
  25:9,14,16 59:17
  67:5 69:9
**orders** 25:15
**outcome** 81:14
**outgoing** 37:4
**outside** 31:17 75:23
**overview** 5:22 6:4,9
  6:16,19 45:3,6,11
  45:20,25 47:3,7
  49:19,23 50:25
  51:6 63:25 65:14
**Oxford** 3:15

**P**

**P** 3:1,1 7:1
**PA** 3:10,16 10:8
**page** 4:2,7 5:2 6:2
  19:25 20:5 23:4,9

27:11 28:3 42:12
  60:24
**pages** 5:18 22:18
  40:19 61:1
**PAGE/LINE** 82:6
**paid** 14:22,25 15:3
  15:13
**paper** 19:18
**paragraph** 17:1
  27:13 29:13 30:12
  30:13
**paragraphs** 30:22
**paren** 30:17,18
  42:15
**part** 13:5 18:12
  33:16 64:8 69:12
  74:11,17 75:10,13
**particular** 30:24,25
  38:23 41:1 42:1,4
  43:7 44:5,7,9 46:5
  58:16 67:24
**parties** 25:6 81:13
**partners** 32:1
**parts** 42:5
**part-time** 13:22
  15:1,4
**patent** 32:3
**patented** 30:16
**patents** 32:4
**pay** 67:11
**paying** 18:17 68:12
  68:13
**payment** 15:9,11
**peer** 4:18,18 28:24
  28:25 34:22,22
  35:4,4,23,23
  50:13,13 73:7,7
  74:11,11 75:23,24
  78:10,10
**pending** 9:24
**Pennsylvania** 1:15
  2:6,8 7:11 81:5
**people** 11:8 12:2
  16:1,3 30:1 34:1,3
  37:12,14 56:7
  58:22,22 59:4
  60:1 65:5 71:17

**people's** 12:12
**Pepper** 58:15
**performed** 31:25
  42:20
**Period** 32:6
**periodic** 15:9,10
**person** 20:25 30:6
  54:19 57:7 67:10
  71:22
**personally** 12:19
  38:24 43:9
**pertaining** 30:25
**Peters** 1:24 2:4
  7:15 81:3,23
**phone** 63:13
**phrase** 60:11,13
**physical** 19:14,21
**picked** 18:16
**pilot** 4:21 36:2,10
**Pittsburgh** 1:15 2:8
  3:10,16 7:11
**place** 2:7 3:9 7:10
  18:22
**placed** 81:7
**plaintiff** 1:6 7:20
**Plaintiff/Relator**
  2:2 3:2
**PLC** 3:14
**please** 7:18 8:2
  9:20 10:6 16:17
  19:11 21:12 22:20
  26:19 27:5 33:5
  36:7 38:8 40:8
  46:18 55:1 60:17
  63:7,11
**pocket** 68:25
**point** 12:7 13:22
  42:14 63:18 64:5
  72:17
**portion** 40:22
**position** 11:5 27:15
**possess** 32:5
**PowerPoint** 64:1
**PPG** 2:7 3:9 7:10
**preparation** 20:9
  20:13,20 26:23
**prepare** 19:22

23:21 24:12,16,20
**prepared** 25:22
  33:7 36:12 38:13
  39:5,21 43:24
**preparing** 25:20
  26:12
**PRESENT** 3:19
**presentations** 24:4
**presented** 33:13
  38:17
**pretrial** 20:14
**pretty** 30:4 69:2
**previous** 30:22
  32:15 34:5 39:13
  41:16
**previously** 19:1
**primarily** 11:12
  58:18 65:9 67:18
  67:21 78:9
**primary** 11:22
**prior** 8:15 25:15
**privileged** 27:15
**probably** 56:5,6
  65:5 68:23
**Procedure** 25:5
**process** 11:10
**processes** 64:15
**produce** 43:4
**produced** 27:10
  40:23 47:20 59:23
**professional** 39:22
**Program** 4:21 36:2
**program-P2P**
  36:10
**project** 12:10,12
**proposal** 5:3 20:8
  38:3 72:12
**proposals** 35:23
**proposed** 4:15 33:1
  33:7
**proposition** 11:21
**proprietary** 34:11
**Protecting** 46:21
**protection** 5:4,7
  38:4 39:1 43:24
**provide** 15:8 39:22
**provided** 23:17

32:19 33:15,19
  36:23 42:1 46:25
  48:9,10 51:13,23
  52:2 72:2 73:11
  74:16 76:6 77:3
**provider** 34:13
**providing** 13:3
  63:17 65:14 77:18
**Public** 2:6 81:5
  82:25
**publicly** 10:18,20
  14:6
**published** 32:9
**purposes** 14:10
**pursuant** 2:3
**P2P** 4:12,21 5:10
  6:6,9,16,19 27:1
  27:16 29:15,17,19
  29:19 30:15,17
  31:17 36:2 39:15
  39:20 46:14,21
  47:3,7 49:19
  50:25 51:6 52:3
  52:24 53:14 75:8
  75:12

**Q**
**Quantifying** 46:21
**quarterly** 44:13
**question** 9:1,18,24
  9:25 17:24,25
  19:9 22:20 24:11
  28:19 30:5,7,24
  30:24 35:9,16
  41:3 49:11 50:14
  50:15 51:8 52:6
  52:13 54:24 55:1
  58:25 59:21 62:2
  66:15,21,22 67:4
  74:6 75:11 78:14
**questioning** 14:9
  69:8
**questions** 9:21
  14:15 23:22 24:13
  25:21,23 27:23
  39:14 50:23 55:1
  63:9 64:6 65:4,7

65:19,23,25 66:2
  66:10 77:24 78:25
  79:2
**quick** 71:7
**quickly** 13:10
**quite** 13:9 69:4
**quote** 23:11,18
  24:2,8 29:14,20
  30:14,19 31:24
  32:6 42:16

**R**
**R** 3:1 7:1
**raid** 63:20
**Raided** 63:20
**Ray** 57:6
**read** 19:10,12
  23:10 54:25 55:3
  71:7,7,18,19 80:4
**reading** 34:1 42:9
  60:13
**real** 67:6
**really** 9:5 12:4
  65:12 67:19 68:1
  78:14
**realtime** 2:5 27:16
  29:11 30:19 81:4
**reason** 11:19,23
  73:13,15,24 75:18
  76:1 82:6
**reasonable** 25:7
**recall** 12:8 13:20
  15:17 20:12 21:18
  26:21 27:8 33:10
  34:19,19 35:17
  40:1 42:3 51:21
  56:23 57:3 60:7
  64:5,12,24 65:1
  65:16,18 68:18
  71:21 74:21,22
  77:21
**RECESS** 21:5
  24:25 37:25 55:12
  69:18
**recognize** 16:18,19
  27:6 41:5 48:2
  49:12,24

**recollection** 34:4
  48:7 60:12 62:16
**record** 10:18,23
  19:12 21:2,4,7
  22:8 24:24 25:2
  27:22 29:15 35:11
  36:9 37:22,24
  38:2 55:3,11,14
  69:17,20 81:9
**records** 19:17 20:4
  59:13
**reduced** 81:11
**reed** 27:13
**REF** 82:4
**referring** 44:5 50:9
**regard** 68:19
**regarding** 19:2
  24:17 66:10
**Registered** 2:4 81:3
**rel** 1:5
**related** 20:7 27:24
  43:12 50:14 57:23
  67:20 70:12 81:12
**relationship** 43:5
  74:23 75:2
**relationships** 11:9
  12:4
**relator** 1:6 3:20
  7:21
**relevant** 43:5 69:12
**remained** 13:23
**remaining** 8:17
  22:11
**remediate** 29:19
**remember** 9:18
  11:6 16:6,12
  18:18 20:17 44:13
  57:9 62:15 63:5,8
  64:21 65:3,7,22
  65:24 66:1
**remind** 9:19
**Renamer** 60:5
**repeat** 9:4 52:6
  54:24 58:24 74:6
**repeating** 22:14
**rephrase** 9:4
**report** 5:19 12:6

43:20,23 44:17,25
  67:22 68:3
**reported** 1:23
  15:23 16:1
**reporter** 2:5,5 7:14
  9:10 19:12 55:3
  81:1,4,4
**reporting** 11:25
  12:3,4
**reports** 44:13
**represent** 40:21
**representations**
  58:21 59:3 65:19
  70:16,17 71:1,11
  74:9
**representative** 31:3
**representatives**
  55:17,22
**represented** 74:3
**request** 34:12
  42:13,14,15 63:23
**requests** 37:20
  42:20 43:3,7,10
  43:17 72:15
**required** 26:4
**research** 73:22
**resources** 59:18
  76:2
**response** 8:14
  38:13
**responses** 9:12
  25:20,21 26:13
**responsibilities**
  13:6 14:21 78:15
**responsible** 55:25
  65:9
**responsive** 43:2,11
**restate** 19:8 70:23
**returned** 31:21
**review** 20:4 36:1
**reviewed** 20:14
  26:23
**reviewing** 20:12
  72:12
**Richard** 12:5
**Richards** 57:6
**Rick** 54:8,10 60:14

77:14
**right** 10:5 19:5
    22:12 23:8 24:2
    30:6 32:22,24,25
    35:13 48:16 61:3
    63:20 66:16 74:1
    77:10 78:22
**ringing** 63:13
**risk** 46:21 73:7
**RMR** 81:23
**Robert** 1:9 3:13,21
    7:25
**role** 25:19 64:7
**roles** 56:7
**room** 62:14 64:2,6
    64:10
**Rosenberg** 66:3,11
**rule** 8:14 9:9 25:4
    61:5
**rules** 8:23 25:5
**Run** 3:4
**running** 69:13

**S**
**S** 3:1 4:6 5:1 6:1
    7:1
**sale** 13:21 14:1
    15:21,22 18:7
    58:2
**sales** 18:2,5
**Sam** 28:22 50:20
    66:3,11
**saying** 30:12
**says** 17:1 23:9,10
    24:2 25:16 27:14
    29:5,14 30:14
    31:24 32:23 33:6
    35:14 36:10 38:15
    39:4,20 42:14
    43:23 45:24 46:20
    48:4 49:23 50:12
    51:18
**Schultz** 1:14 2:1
    4:3,7,8 5:2 6:2
    7:4 8:3,8,13,16,22
    10:7 14:20 16:13
    16:13,16 21:8,11

21:12 25:15 26:16
    26:18,19 27:1,5
    28:6,11 32:19,22
    32:23 33:1,4
    34:22,25 36:2,6
    38:3,7,7,25 39:3
    39:15,19 40:5,8
    40:17,18 41:6
    42:1,8 43:20,22
    45:1,2,15,20,23
    46:14,18 47:3,6
    47:14,23 48:1,12
    48:14,23 49:19,22
    50:25 51:3,15,17
    55:16 60:17,18,19
    60:20 61:4 69:22
    79:5 80:3
**scope** 22:9,10 26:9
    32:14 61:22 67:5
    69:8
**search** 25:7 61:6,9
    61:14,16 75:12,19
**searches** 29:15 32:3
    50:5,11,13,16
    64:11,13 76:5
    78:20
**searching** 75:8,23
**second** 12:13 37:22
    42:12
**section** 42:12,13
**security** 33:8 35:22
    36:12,21,23 39:5
    39:23 40:14 43:25
    51:7 55:17,22
    71:2
**see** 9:9 12:21 13:6
    19:25 23:19 24:9
    27:15,17 28:4
    37:18 42:17 59:13
    64:8
**seeing** 21:18 26:21
    27:8 33:10 35:17
    43:16 51:21 74:21
**seeking** 13:7
**seen** 21:13,14,16
    22:2,3,22,24,25
    23:3,4 26:20 27:7

27:9 33:6,9 35:7
    35:16 36:8,15
    38:9,10,11 39:7
    39:24 40:9,11,24
    41:13,25 44:1,9
    44:11 45:8 46:2
    46:19,23 47:8
    48:6,25 49:25
    50:2 51:9,10,19
    61:7,13,14,15,16
    77:13
**seize** 61:6
**send** 34:12
**sense** 14:20
**sentence** 28:20 29:5
    29:6 30:14 31:24
    50:12
**sentences** 29:13
**September** 12:15
**served** 19:1 75:4
**services** 4:15,19
    5:11 6:22 13:3
    15:8 33:1,7,16,20
    33:22,24 34:1,4,6
    34:23 35:4 36:11
    39:16,21,22 45:7
    46:1 51:15,18
    73:12 76:6 77:18
    78:7
**servicing** 13:8
**set** 81:17
**Setting** 54:13
**Sewickley** 10:8
**shakes** 31:12
**shaking** 9:9,16
**share** 56:8
**shared** 42:10
**shareholders** 68:4
**sharing** 73:8
**sheet** 80:8 82:1
**shifted** 13:9
**shook** 69:25
**shortly** 14:1
**show** 16:15 20:23
    27:4 34:25 36:5
    39:3,19 40:8,17
    43:22 45:1,23

47:6,14 48:1,14
    49:22 51:3,17
    52:24
**Showing** 33:4
**Shultz** 82:3,23
**sifting** 37:15
**signature** 79:7
    80:12 81:15
**signed** 14:3 15:18
    16:21,23 80:8
**similar** 22:25 23:3
    27:9 38:11,20
    44:12,15 50:2
    56:7 75:4
**sitting** 64:12
**six** 15:19,20 56:12
    56:17
**skip** 10:21
**software** 57:9
**sold** 17:3,5,13,15
    17:21,21 18:7,15
**sole** 8:13,17
**solicitation** 35:14
    38:14
**soliciting** 13:2
**solutions** 6:3 7:16
    45:20,25
**somebody** 77:1
**sorry** 28:5 32:21,25
    42:8 49:3 52:6
    58:6,24 78:11
**sort** 13:11 50:1
    56:3
**sounded** 75:3
**source** 29:17 42:16
    75:7
**Southern** 1:2 7:7
    62:7,25
**space** 19:21
**speak** 20:19 73:5
**speaking** 24:11
    74:22
**specialist** 7:14
**specific** 12:24
    22:21,25 23:4
    27:8,9 36:15
    44:19 63:9 64:21

65:17 68:19 72:15
**specifically** 12:8
    43:9,10,19 60:23
    64:11,22 78:17
**speculate** 68:22
**speculating** 73:10
**spoke** 56:10 69:23
**spread** 29:18
**SQL** 53:20
**standpoint** 29:25
**stand-alone** 78:20
**start** 10:5 11:1
**started** 11:4,5
    12:14
**starts** 51:5
**state** 2:7 81:5
**stated** 11:23 23:23
**statement** 4:12 5:6
    27:1 30:25 32:11
    36:11,19 38:25
    39:4
**states** 1:1,4 7:4,6
    24:16 26:11
**stating** 17:10
**station** 64:13
**stay** 13:16
**stayed** 13:19
**steady** 15:9,10
**stenographically**
    81:10
**stop** 15:15
**store** 19:15 54:9,17
    57:17,20 58:4
    64:9
**strategic** 32:1
**strategy** 13:11
**Street** 3:15 10:7
**strike** 18:1 42:9
    53:11
**struck** 26:1
**stuff** 47:20
**subject** 59:21
**suggest** 73:23
**suggesting** 54:12
**Suite** 7:10
**summary** 6:14
    48:12,25

**support** 32:3 61:5
**sure** 8:24 14:12
  17:16 18:18,23
  22:5 23:6,7 28:21
  29:1 55:9 57:15
  58:25 61:16 66:1
  74:7,13 75:11
  77:15 78:11
**surprise** 74:14
**suspect** 54:14 73:6
**swear** 8:2
**sworn** 8:4
**systems** 30:16
  54:20 62:14 64:9
  64:14 75:19 76:2
  78:6,9,14,17

**T**

**T** 4:6 5:1 6:1
**table** 62:12
**Tagliaferri** 12:1
  71:15
**take** 9:22 16:17
  21:12 24:21 25:8
  25:9 26:19 27:5
  33:5 34:15 36:7
  38:8 40:8 46:18
  55:8 69:15
**takedown** 6:22
  33:15,19,22,24,25
  34:4,6,12 42:13
  42:14,15,20 43:6
  43:10,17 51:15,18
**taken** 2:3 81:6,10
**talk** 14:4 37:8 41:4
  61:17,19
**talked** 34:20
**talking** 31:21
**tape** 7:2
**tapes** 19:15
**taxes** 67:15
**team** 56:3 65:12
**tech** 57:25
**technical** 28:23
  29:25 30:2 31:20
  53:19 55:4
**tell** 9:2 16:17 21:13

26:20 27:6 28:10
  33:5,25 36:7 38:8
  40:9 46:18 75:1
**ten** 11:7 12:2 57:1
  64:3 65:6
**term** 60:16 63:20
**termed** 18:5
**terms** 19:25 21:22
  25:24
**testified** 8:5
**testify** 24:17
**testimony** 54:11,13
  71:19 80:5,6 81:9
  81:10
**Thank** 8:19 28:17
  35:24 41:25 49:9
  79:1
**thereof** 23:11 24:3
**thing** 53:19
**things** 11:8 19:16
  31:13,16,18 41:17
  67:13
**think** 11:22 12:8,15
  14:6,9,14 16:1,9
  17:16 18:13 19:18
  20:7 22:18,25
  23:1,3 24:19 25:3
  25:13 26:8,10
  27:7 28:21,22,24
  29:4 30:6,21 31:2
  31:19 34:7,14
  35:7,23 36:15
  38:20 44:9 49:1,4
  49:25 50:20 51:10
  54:21 57:4,7,14
  59:20 60:15,16,19
  60:24 61:12,13,15
  63:18,23,23 68:23
  68:24 69:3,25
  71:18 72:24 74:20
  77:13,20
**third** 27:11,13
**thousands** 76:11
**three** 16:1,3 17:19
  68:2,7,8
**Thursday** 1:16 2:8
**ticket** 41:1

**tickets** 5:17 40:18
  40:22 74:21
**Tiffany** 23:13 24:5
**time** 9:23 10:25
  11:8,12,24 12:13
  12:18 13:17,19,20
  14:1 20:1 21:4,7
  21:25 24:24 25:2
  29:10 30:18 31:13
  32:7 33:13 34:5
  34:18 37:24 38:2
  41:16,17 46:8
  47:21 52:9 55:11
  55:14 56:5,10
  57:2,10 69:17,20
  69:22 71:21 72:17
  75:17,22 76:6,18
  77:21,22 79:6
**times** 12:8,9,23
  13:1 75:21
**timestamp** 52:11
**timestamps** 52:1
**title** 11:6 16:6
  53:21
**titled** 47:7 48:24
  61:4
**Tiversa** 1:8,8,8 3:7
  3:7,7 4:12 5:17,21
  6:11 7:5,23 8:17
  10:12,13,22 11:1
  11:4,24 12:14,20
  13:23 14:25 15:3
  17:1,2,2,3,21 18:3
  18:19,19 20:1
  23:12,17 24:4
  25:10,10,17 27:1
  27:10 29:14 32:4
  33:15 34:17 38:13
  40:18 41:16 42:19
  43:24 44:14 45:2
  45:5,24 46:20
  47:7,23 48:3,4,24
  50:3,4,10,16,18
  51:25 52:8,24
  53:3,13 55:18,21
  56:20 57:16 58:3
  58:21 59:3 60:1

65:9,20 67:7 70:3
  70:6 71:3 73:11
  73:14 74:3,9,16
  75:8,12,18 76:5
  78:6,15 82:2
**Tiversa's** 8:9 27:14
  30:16 32:4 53:4
**Tiversa-prepared**
  36:19
**TIVSDNY** 4:10,13
  4:16,20,23 5:5,8
  5:13,15,22 6:4,7
  6:10,12,14,17,20
  6:23 26:16 27:2
  33:2 34:23 36:3
  38:4 39:1,17 40:6
  45:3,21 46:15
  47:4,24 48:12
  49:20 51:1,15
**TIVSDNY-005383**
  28:13
**TIVSDNY-007785**
  28:3
**TIVSDNY-5385**
  27:13
**today** 10:14 18:20
  18:24 19:23 26:23
  50:13 54:21 55:5
  57:17 59:19 60:2
  64:19 67:7 70:7
**today's** 20:10,13,20
**told** 56:16
**tomorrow** 67:8
**tool** 60:6
**top** 35:3 48:4 49:23
  51:6,18
**topic** 23:22 24:13
**topics** 21:22 22:19
  22:21,22 23:9
**Tormasi** 16:7 56:4
  57:5 71:10 74:25
**track** 29:18 67:15
  69:2
**transaction** 17:17
**transcript** 8:23
  34:2 81:8
**transcription** 80:6

**TransPerfect** 7:15
**Transportation**
  33:7 39:5,23
  40:14 43:25 55:11
  55:22 71:2
**tread** 62:3
**true** 27:19 28:20,25
  30:20 31:5 32:7
  32:12,17 66:8
  80:5 81:8
**trust** 76:19,25
**truth** 64:17
**try** 9:12,18,19
  13:15 16:12 56:24
**trying** 17:13 25:24
  41:24 43:12,14
  46:10 49:15 57:4
  73:6,8
**TSA** 4:15 5:14,19
  14:11 18:25 19:4
  22:11 23:15 24:7
  24:18 32:19 33:1
  33:13,16 38:17
  39:10 40:3,5 42:6
  42:11,21 43:5,17
  43:20 45:13,18
  46:12 47:1,12
  48:9,11 49:17
  51:13,23 52:2
  56:1 58:22 59:4
  63:4 64:21 65:20
  66:5 70:16,17
  71:3,11 72:4,7
  73:1,5,12 74:10
  74:17 75:9,14
  76:3,7 77:18 78:7
  78:12,16,20
**TSA-related** 74:10
  75:9,13,20
**TSA-specific** 65:1
**TSA0002** 5:18
  40:19
**turn** 23:8 27:11
**twice** 10:22
**two** 2:7 3:9 7:10
  19:25 30:22 55:1
  57:8 62:5 68:9

**type** 44:25
**typed** 4:10 26:16
**typewriting** 81:11
**typically** 30:15,17

---

**U**

**uh-huh** 9:13
**Um** 68:15
**understand** 8:10
  9:1,3 10:23 17:24
  17:24 22:15 34:9
  38:12 41:21 43:14
  45:10 46:10 49:14
  64:14 73:8 75:11
**understanding** 9:5
  18:16 25:4 29:9
  29:11 34:6,16
  63:1,2 69:5 71:17
  72:25 74:12
**understands** 8:24
**understood** 30:9
  62:6
**Unfortunately**
  60:18
**unique** 27:14
**Unit** 2:7 3:10
**United** 1:1,4 7:4,6
**upstairs** 64:10
**USA** 82:2
**use** 58:17 75:19
  78:6
**user** 29:15 34:15
**users** 30:16,17,18
**usually** 52:22
**U.S** 61:20 62:24

---

**V**

**v** 7:5 82:2
**Valley** 3:4
**value** 11:21 27:14
**varied** 53:1
**various** 31:25
  58:17 60:15 62:14
**vein** 25:22
**verbalize** 9:11
**Verdream** 3:14
  7:24,24 19:7 28:2

28:9,14,17 29:21
  32:21,24 33:17
  49:9 50:6,22 52:4
  53:8 54:4,22
  57:18 58:9 61:24
  63:14 66:6,17,24
  69:10 70:20 71:4
  72:18 73:3,17
  74:4,18 75:16
  76:13,22 77:11
  78:25
**video** 7:14
**videographer** 3:22
  7:2 8:1 21:3,6
  24:23 25:1 37:23
  38:1 55:10,13
  69:16,19 79:4
**videotaped** 7:3
  79:5
**Vision** 78:9
**visit** 65:17
**volumes** 37:16
**voluntarily** 63:24
**VP** 15:25 16:4,5
**vs** 1:7
**vulnerability** 4:22
  36:2,11

---

**W**

**W** 3:3,3
**waived** 81:16
**walked** 64:4
**Wallace** 12:5 54:8
  54:10
**Wallace's** 60:14
  77:14
**want** 8:23,24 11:2
  11:14 22:7,13,19
  30:5 40:23 48:22
  60:23
**wanted** 64:8 66:20
**warrant** 61:6,9,15
  61:16
**Washington** 62:7
**wasn't** 50:9 65:13
  69:12
**way** 12:3 55:6

73:20
**web** 5:21 29:8,10
  45:2,6,6,11
**week** 71:20
**went** 15:18 63:6,12
  64:6,10
**weren't** 12:4 18:17
**we'll** 56:24 62:3,3
**we're** 16:15 18:24
  21:3 24:23 30:12
  55:10 77:8
**we've** 64:18 70:1
**WHEREOF** 81:17
**William** 23:13 24:6
**witness** 2:2 8:2,4
  20:24 31:12 32:23
  37:8 59:22,25
  78:4,24 79:3 81:7
  81:16,17
**words** 9:12
**work** 4:13 5:6
  12:12 27:1 36:11
  36:19 38:25 39:4
  76:2
**worked** 10:22,25
  64:15
**working** 11:1 12:14
**wouldn't** 30:5
  74:14
**write** 67:9,11 70:11
**written** 28:5
**WW** 27:15 29:16
  29:19

---

**X**

**X** 4:1,6,6 5:1,1 6:1
  6:1

---

**Y**

**Yague** 23:14 24:6
**yeah** 12:15 13:18
  16:25 23:7 24:21
  28:23 29:6,24
  30:10 31:6,23
  32:17 35:11 41:19
  45:11 48:19 53:11
  53:12,16 58:10,13

59:1,25 65:1 69:5
  70:6,22 73:13,13
**yes/no** 66:20
**York** 1:2 7:7 62:8
  63:1 69:24

---

**0**

**0053835400** 4:14
  27:2
**006028-6032** 6:5
  45:21
**006034-6038** 5:23
  45:3
**006236-6261** 6:8
  46:15
**00643-6661** 4:24
  36:3
**00652-8654** 6:23
  51:16
**007329-7338** 6:15
  48:13
**007371-7373** 6:13
  47:24
**007386-7397** 5:9
  39:1
**007456-7457** 4:20
  34:23
**007574-7584** 5:5
  38:4
**007785-7792** 4:17
  33:2
**0077937796** 6:10
  47:4
**008263-8273** 6:18
  49:20
**008356-8366** 6:21
  51:1
**008373** 4:11 26:16
**009104-9121** 5:13
  39:17
**009603-9637** 5:16
  40:6

---

**1**

**1** 4:8 16:13,16
  23:15 24:7 60:18
**1.5** 50:5,11,12,16

50:17
**10** 5:10 39:15,19
  60:25 65:5
**10th** 60:24
**10:06** 69:17,18
**10:13** 69:18,20
**10:23** 79:6,8
**11** 5:14 40:5,8
**12** 5:17 40:17,18
  41:9 42:2,8
**12th** 60:24
**13** 5:19 43:20,22
  45:15,16 81:24
**14** 5:21 45:1,2
**14th** 3:15
**14-cv-4548** 1:6 7:8
**15** 6:3 45:20,24
**15143** 10:8
**15219** 3:16
**15222** 3:10 7:11
**16** 4:8 6:6 46:14,18
**17** 6:9 16:24 47:3,6
**18** 1:16 2:9 6:11
  7:11 47:23 48:1
  82:4
**19** 6:14 48:12,14,24
  49:2

---

**2**

**2** 4:9 17:1 21:8,12
  60:17,20 61:4
**20** 6:16 30:17 49:19
  49:22
**2006** 11:3
**2009** 11:14,25 32:8
  32:10 70:3
**2010** 4:23 5:12
  23:15 24:8 29:1
  30:20 31:2 33:8
  36:3,14 39:16
**2011** 5:4,8,15 38:4
  39:1,6 40:6
**2012** 5:19 43:20,23
**2013** 23:16 24:8
**2016** 12:16
**2017** 17:4
**2018** 56:18,19

**2019** 1:16 2:9 7:11
  16:24 22:10 81:18
  82:4
**2020** 81:24
**21** 4:9 6:19 50:25
  51:3
**22** 6:22 51:15,17
**24** 30:19
**25628** 1:25 82:4
**26** 4:10 22:10
**27** 4:12

**3**
**3** 4:10 26:16,19
  28:11 32:22 60:19
**3,125** 30:16
**30B** 31:3
**30(b)(6)** 4:9 8:9,14
  8:18 21:8 22:9,11
  25:4
**30040** 3:4
**301** 3:15
**31** 23:16 24:8
**33** 4:15
**34** 4:18
**36** 4:21
**365** 30:19
**38** 5:3,6
**39** 5:10

**4**
**4** 4:12 27:1,5 32:19
  32:23
**4.2010** 4:13 27:2
**40** 5:14,17
**400** 2:8 3:10 7:10
**41** 61:5
**412.281.7272** 3:11
**412.394.2332** 3:17
**43** 5:19
**45** 5:21 6:3
**46** 6:6
**47** 6:9,11
**48** 6:14
**49** 6:16

**5**

**5** 4:15 33:1,4
**5.2010** 4:16 33:1
**50** 6:19
**51** 6:22
**5383** 28:12
**5400** 28:16
**5470** 3:4

**6**
**6** 4:18 17:4 34:22
  34:25
**659** 10:7
**678.697.1278** 3:5

**7**
**7** 4:21 23:8,10
  30:19 36:2,6
  42:12

**8**
**8** 4:4 5:3 24:2 38:3
  38:7
**8:36** 1:16 2:9 7:12
**8:51** 21:4,5
**8:52** 21:5,7
**8:57** 24:24,25

**9**
**9** 5:6 38:25 39:3
**9:03** 24:25 25:2
**9:19** 37:24
**9:20** 37:25,25 38:2
**9:40** 55:11,12
**9:49** 55:12,14